## Wilson v. Commonwealth.

(Decided December 16, 1910.)

### Appeal from Whitley Circuit Court.

1. Voluntary Manslaughter Under Indictment for Murder—Conviction—Indeterminate Sentence—Under an indictment for murder appellant was found by verdict of the jury guilty of voluntary manslaughter. By sentence and judgment of the court his punishment was fixed at confinement in the penitentiary at hard labor "for an indeterminate period of time not less than two nor more than twenty-one years." Held, That as there was evidence conducing to prove the homicide unnecessary and there was no prejudicial error in any ruling of the trial court, the verdict and judgment should not be disturbed.

2. Same—Dying Declaration—Competency of—Hearing and Passing Upon in Presence of Jury.—While it the safer practice for the trial court, in determining whether evidence as to dying declarations is competent, to hear and pass upon its competency in the absence of the jury, yet in allowing it in this case in their presence, no error was committed, in view of the painstaking care of the court in excluding from the consideration of the jury what was incompetent.

3. Same—Remarks of Commonwealth's Attorney in Argument.—The remarks of the Commonwealth's Attorney in argument to the jury, objected to, were not prejudicial in view of the admonition of the court to the jury not to consider them.

4. Same—New Trial—Refusal of—Newly Discovered Evidence.—No error was committed by the court in refusing appellant a new trial upon the alleged newly discovered evidence shown by the affidavits filed, as the new evidence was merely cumulative and such as by reasonable diligence could have been produced on the trial.

5. Same—Indeterminate Sentence Act—Board of Penitentiary Commissioners—Regulating of Sentence By.—Neither the act of March 7, 1910, under which the indeterminate punishment adjudged against appellant was inflicted nor the act of March 16, 1910, under which the Board of Penitentiary Commissioners may regulate his imprisonment between the minimum and maximum limits fixed by the judgment of conviction, is unconstitutional. The act first mentioned does not deprive the defendant of his right of trial by jury, nor encroach upon the powers of the judiciary. Section 7 Bill of Rights, Constitution, only guarantees the right of trial by jury as according to the ancient or common law mode and at the common law the jury only determined whether the defendant was guilty; punishment in the case of a verdict of guilty being fixed by judgment of the court. So in permitting the jury to determine the defendant's guilt or innocence, the act conformed the trial to the requirements of the Bill of Rights. The act does

not encroach upon the powers of the court for the court fixes the punishment after the verdict of guilty, which cannot be less than the minimum nor more than the maximum term provided by the statute.

6 Act Does Not Confer Arbitrary Power.—The act defining the powers of the Board of Prison Commissioners does not confer upon it arbitrary powers. The act gives the Board authority to parole the convict, and following such parole to discharge him after the minimum term of imprisonment shall have been served, provided, his behavior has, during his imprisonment conformed to the standard of conduct fixed by the act. The powers given the Board to discharge the convict short of the maximum term of imprisonment is no more unconstitutional than is the power to parole, which it has long exercised and the power to do so neither interferes with that of the Governor to commute the punishment of the convict, or pardon him. When the act provides that no person shall be eligible to parole except on certain conditions, it necessarily means that those who comply with the conditions shall be eligible to parole, and that the duty of granting such parole to a person entitled thereto, the Board of Prison Commissioners may be required, in a proper state of case, to perform.

TYE & SILER and STEVENS & STEELEY for appellant.

JAS. BREATHITT, Attorney General, T. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

On Sunday, August 7th, 1910, the appellant, Tilden Wilson, inflicted two wounds upon Joshua Rhodes with a pistol. The first shot passed through one of Rhodes' legs; the second, and fatal shot, entered his breast. Rhodes died an hour or so after the shooting.

The indictment returned against appellant for the homicide charged him with the crime of murder. On the trial, the jury by the verdict returned, found him guilty of voluntary manslaughter without fixing his punishment, but the judgment entered thereon provided that he should be confined in the penitentiary at hard labor "for an indeterminate period of time of not less than two nor more than twenty-one years."

Appellant moved for a new trial upon numerous grounds, but the motion was overruled, and he has appealed.

The main facts as to the homicide were that as appellant, accompanied by his two sons, aged six and eight years, respectively, was on the way to the residence of

Craig Inman to return a mule borrowed of him, he overtook deceased who was going to a nearby church; having just left his home near the place of the homicide for that purpose. Deceased was an old man, though of larger build than appellant, and he had cut that morning a green hickory stick with which he was walking.

When first seen by appellant who had to pass his house in going to Inman's, deceased was in the road in a stooping position and appeared to be tying his shoe. When appellant got to deceased, he spoke to him saying: "How are you Uncle Josh?" To this salutation deceased replied: "How do you do?" And added, "Tilden, I want to know what in the hell you run down off the mountain and jumped on Henry the other morning for?" Henry thus referred to was a son of deceased's, with whom appellant had previously exchanged some words of anger about a goose. The charge of jumping on Henry Rhodes was denied by appellant, whereupon deceased, according to appellant's testimony, raised his stick and advancing upon him, said: "You G— d— son of a liar, you did, you aint talking to Henry now, you are talking to me."

This declaration, according to appellant's further testimony, was followed by repeated attempts on the part of deceased to strike him with a hickory stick; that several of the blows aimed at him appellant warded off with his hands and at one time he caught and tried to hold the stick, but deceased jerked it from him and continued the attack upon him; that at that juncture appellant drew his pistol and shot deceased in the leg, and after a short interval fired the second shot which inflicted the wound in the breast that caused his death. It was also testified by appellant that he shot deceased in self-defense, at the time believing that he was in imminent danger of death or great bodily harm at his hands, and that his only means of safety lay in the use of the pistol.

Bob Veach, a witness for the Commonwealth, and Grant Paul and Bertha Ricketts, witnesses for appellant, testified that they heard the parties quarreling, but could understand little of what was said by either of them. They, however, saw deceased strike at appellant with the stick and saw the latter shoot him. In point of fact their testimony largely corroborated his.

Appellant proved by two or more witnesses threats on the part of deceased to attack him, one or more of

which was communicated to him before the homicide. It was, however, the theory of the Commonwealth and its evidence tended to prove, that appellant was seeking deceased with the intention of taking his life, and had provided himself with a pistol and brass knucks for that purpose, though the knucks were not used; that deceased was on his way to church when killed, and that though he spoke abusively to appellant on account of some fancied wrong done his son by the latter, and even threatened or attempted to strike him with his stick, his feebleness from age and rheumatism prevented him from inflicting any real injury and that appellant could have gotten out of his way or taken the stick from him and thereby avoided shooting him. In other words, the contention of counsel for the Commonwealth on the trial, was, that the killing of deceased was unnecessary; therefore the act was either murder or voluntary manslaughter, and the jury having found appellant guilty of the lesser crime and there being some evidence to support that conclusion, this court, unless there was some error prejudicial to appellant's rights committed by the trial court, will not disturb the verdict. Whether there was such error remains to be seen.

But four of the numerous grounds complained of as error by appellant in the motion for a new trial, are now urged for a reversal, viz: 1st. The admission of incompetent evidence. 2d. Misconduct of the Commonwealth's attorney in his argument to the jury. 3d. Unconstitutionality of the statute authorizing the determinate punishment inflicted by the judgment. 4th. The refusal of a new trial.

The alleged incompetent evidence was with respect to the dying declarations of the deceased. We gather from the record that practically all the evidence as to what was said by deceased on this subject was, after its admission, excluded by the court's mentioning to the jury each witness who had testified as to the alleged dying declarations, telling them what each had said and admonishing them not to consider any of it in arriving at a verdict. Appellant does not, of course, complain of the exclusion of this evidence, but contends that the court erred in allowing its introduction in the first place in the presence and hearing of the jury, and that this error was not cured by its subsequent exclusion and the admonition to the jury not to consider it. In other words, it is insisted for appellant that when the evidence in

question was offered the court should have required the jury to retire in order that it might be heard by the court alone and its competency or incompetency determined in the absence of the jury; but that in failing to take this course and in permitting the jury to hear the evidence they necessarily considered it to appellant's prejudice, notwithstanding its subsequent exclusion by the court and the admonition to them not to consider it. This contention is not without force, but we are unwilling to sustain it upon the record, as presented. In determining whether evidence of a dying declaration is competent, it is undoubtedly the safer practice for the court to hear it in advance of its introduction before the jury and in their absence, in order that they may get no impression from it that would be prejudicial to the defendant, if the court should rule it incompetent and reject it; but in view of the painstaking care of the trial court in excluding from the jury in this case the evidence referred to, and the explicit admonition given them to disregard it, we are unable to see that appellant was prejudiced by its introduction. This view of the matter is sustained by numerous authorities. In Roberson's Crim. Law, section 227, it is said:

"It is discretionary with the trial court whether or not the preliminary proof necessary to the admission of dying declarations, shall be conducted in the presence of the jury."

To the same effect is the following statement found in 21 Cyc., 895:

"The preliminary proof to determine the admissibility of alleged dying declarations may be conducted in the presence of the jury, or otherwise."

The improper statement of the Commonwealth's attorney alleged to have been made in argument to the jury was, in substance, that the jury, in order to acquit appellant on the ground of self-defense, must believe from the evidence beyond a reasonable doubt that he was in danger of loss of life or great bodily harm. When appellant's counsel objected to this statement the court, in effect, excluded it from the consideration of the jury by telling them they had the instructions and should try the case according to the law and evidence. Following this admonition of the court, the Commonwealth's attorney turned to appellant's counsel, from whom the objection came, and said to him: "I know the law and know it hurts you," and when this statement was also ob-

jected to by appellant's counsel, the court admonished the jury not to consider the statement of the Commonwealth's attorney in arriving at the verdict. The bill of exceptions being somewhat indefinite on this point, it is difficult to determine whether the court's admonition included the exclusion from the jury of the first as well as the last remark of the Commonwealth's attorney; but we think it reasonably clear from all that was said by the court that they must have understood that consideration of both statements of the Commonwealth's attorney was denied them. While the statements were obviously improper, they were not so prejudicial as to authorize a reversal of the judgment.

But appellant's chief contention is that the judgment should be reversed because the statute under which the indeterminate punishment adjudged against him was inflicted, and that under which the board of penitentiary commissioners may regulate the period of his imprisonment in the penitentiary between the minimum and maximum limits fixed by the judgment of conviction, are both unconstitutional. The act first mentioned, designated as chapter 4, was approved March 7, 1910, and may be found in the bound volume of Acts of 1910, page 22; it reads as follows:

"Section 1. That all of section 1136, chapter 36 of the Kentucky Statutes, be stricken out and the following substituted therefor, so that said section as re-enacted shall read: That the jury by which an offender indicted for a felony is tried shall ascertain only whether or not said person is guilty of the offense charged; if said person shall be found by the jury guilty of a felony, the jury shall so state in its verdict; and if the indictment under which he is prosecuted charges an offense consisting of more than one degree, shall find and in the verdict say of what degree they do find him guilty; after such finding or the verdict of the jury, the court trying said offender shall pronounce upon such person an indeterminate sentence of imprisonment in the penitentiary for a term, stating in such sentence and judgment the minimum and maximum limits thereof, and fixing the minimum time of such imprisonment the term now or hereafter prescribed by law as the minimum term of imprisonment for the punishment of the offense stated in the verdict and as the maximum time of such imprisonment the term now or hereafter prescribed by law as the maximum term of imprisonment for the punishment of such offense; pro-

vided, however, in the trial of persons charged with the commission of a felony punishable by death or confinement in the penitentiary for life, if said person is found guilty by the jury it shall also prescribe the punishment in its verdict and the court trying said offender shall pronounce upon such person a sentence of death or imprisonment for life, as found by the jury. A person sentenced to life imprisonment under the provisions of this act shall be eligible to parole as now or may hereafter be prescribed by law.

"The jury by which an offender charged with a misdemeanor is tried, or if a jury trying a person indicted for a felony shall find such person guilty of a misdemeanor, the jury shall fix by its verdict the punishment to be inflicted within the periods or amount prescribed by law.

"Persons sentenced to punishment by confinement in the penitentiary shall be kept at hard labor; and, in cases where the punishment is a fine or imprisonment in the county jail, or both, the imprisonment shall be by close confinement in the jail of the county where the trial was had, unless otherwise provided; and the prisoner shall also be confined in the jail until the fine and costs are paid, unless otherwise provided.

"Section 2. All acts and parts of acts in conflict herewith are hereby repealed."

Section 1136, Kentucky Statutes, repealed by the foregoing act, was as follows:

"The jury by whom an offender is tried shall fix, by their verdict, the punishment to be inflicted within the periods or amount prescribed by law. Persons sentenced to punishment by confinement in the penitentiary shall be kept at hard labor; and in cases where the punishment is a fine or imprisonment in the county jail, or both, the imprisonment shall be close confinement in the jail of the county where the trial was had, unless otherwise provided; and the prisoner shall also be confined in the jail until the fine and costs are paid, unless otherwise provided."

It is argued by counsel for appellant that the act of March 7th, 1910, is obnoxious to the Constitution, in that it impairs the right of trial by jury, encroaches upon the power of the judiciary and takes from both court and jury the power to fix the punishment for felonies, except such as are punishable by death or confinement in the penitentiary for life. Moreover, that the

power of which the court and jury are thus deprived, it confers upon a mere ministerial board without judicial functions or power.

In point of fact the act, supra, does not of itself confer any power upon the board of penitentiary commissioners. The powers possessed by that board and by virtue of which it takes control of those receiving indeterminate punishment under the act of March 7th, 1910, and regulates the extent of their imprisonment in the penitentiary, are confided to it by another act of the Legislature, approved March 16th, 1910, designated as chapter 16, found in the bound volume of the acts of 1910, page 61, and the two acts must be considered together in determining what are the powers and duties of the board of penitentiary commissioners with respect to persons convicted of felonies as provided by the act of March 7th, 1910.

But proceeding for the present with the consideration of the act of March 7th, 1910, we do not find it open to the objections urged by appellant's counsel. It does not deprive one charged with crime of the right of trial by jury as provided by section 7, Bill of Rights, Constitution, which declares:

"The ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution."

What is here guaranteed is the right of trial by jury according to the "ancient mode;" that is as was the right of trial by jury at the common law. At the common law the jury either returned special verdicts, setting forth the facts supporting the prosecution and prayed the judgment of the court thereon, or a general verdict of guilty. Thereupon the punishment was fixed by the court and enforced by ministerial officers charged by the law with that duty. 4th Blackstone's Commentaries, page 361.

Does not the act, in allowing the question of the guilt or innocence of the accused determined by a jury, conform the trial to the requirements of the Bill of Rights? Manifestly so. As well said in Bradley v. Illinois State Reformatory, 148 Ill., 420, in discussing this question:

"Nor is it true that a prisoner on trial for burglary and larceny, or for any other violation of the criminal law, has a constitutional right to have the quantity of punishment fixed by a jury. * * *"

After adverting to the common law requirement of a trial by jury to determine the prisoner's guilt or innocence and the fixing of his punishment by the court, the opinion further says:

"The constitutional right of trial by jury is limited to a trial of the question of guilt or innocence, and we think there can be no question of the validity of the sections of the statute to which we have made reference in this connection." George v. People, 167 Ill., 447; Miller v. State, 40 L. R. A., 109.

It is, however, insisted for appellant that the act in question also takes from the court the power to fix the punishment after the jury determines his guilt. We do not think this is so, for the court after the return of the verdict of guilty, in passing sentence upon the defendant and entering judgment on the verdict, fixes his punishment, as directed by the act; the punishment so fixed being confinement in the penitentiary not less than the minimum nor more than the maximum time provided by statute, and this fixing of the punishment by the court is as necessary to the confinement of the defendant in the penitentiary as is the return by the jury of the verdict determining his guilt, the whole constituting a trial and conviction in due form satisfying every requirement of the law. The fact that the board of penitentiary commissioners, may after the incarceration of the prisoner in the penitentiary, parole him or otherwise lessen the period of his punishment, does not affect the legality of the trial or invalidate the conviction of the defendant. Our conclusion is, therefore, that the act is not obnoxious to any provision of the Constitution.

Let us now see whether the act of March 16th, 1910, under which the board of penitentiary commissioners derives its powers, violates the Constitution.

Sections 1 to 7 inclusive, define in specific terms the duties and powers of the board in the matter of paroling convicts, declares who of the latter may be paroled, what conduct shall entitle them to be paroled or discharged, the authority of the board over them while under parole and the causes for which such paroles may be revoked. Section 8, which authorizes the discharge of paroled prisoners, provides:

"When any prisoner imprisoned under an indeterminate sentence and paroled under this act shall have faithfully kept and observed the terms of his parole, obeyed the law, remained sober, industrious and honest in his

demeanor for the full term of twelve consecutive months while so on parole the board of penitentiary commissioners shall have power and authority to finally discharge said prisoner from custody, if in its judgment such discharge would be proper; and in event of such final discharge, he shall not be thereafter subject to reimprisonment by reason of the conviction under which he was originally committed. But nothing in this act shall be construed as entitling such paroled prisoner to such final discharge except at the discretion of the said board, and the decision of said board on all applications for discharge shall be final and conclusive, unless subsequently modified or changed by it.''

It will be observed that the powers conferred upon the board of penitentiary commissioners cannot be exercised by it until after there has been a trial and conviction of the prisoner according to law, and he has been incarcerated in the penitentiary, therefore, the powers confided to the board are not in any sense judicial, but purely ministerial and similar in character to the power conferred upon the Governor of the State to grant reprieves, commutations and pardons, after conviction. The power given the board to shorten the term of imprisonment of persons confined in the penitentiary is no more unconstitutional than the power to parole them, which it has long exercised under a previous act of the Legislature; nor is the power to lessen the period of imprisonment or discharge the prisoner, any more an interference with the judicial functions of the court in which he was convicted, than is the power to grant a parole.

In George, et al., Com'rs v. Lillard, Warden, 106 Ky., 820, we held that the parole law, a predecessor of the act in question, was not unconstitutional, nor did it in any way encroach upon the judicial functions of the courts, or the power of the Governor to pardon.

It is also argued for appellant that the act, supra, is unconstitutional, in that it gives unlimited power to the board of penitentiary commissioners to discharge persons confined in the penitentiary without fixing a standard by which they shall be entitled to such discharge. We do not think this is true, for sections 1, 2 and 8 clearly indicate the standard by which the convict must regulate his conduct to entitle him to a parole or discharge. Sections 1 and 2 provide upon what grounds the power and authority of the board to parole shall be exercised, and in addition, sections 1 and 8 confer upon the board

the power to finally discharge such paroled prisoner as shall have been "submissive to the laws, obedient to the terms of his parole, upright in his conduct and industrious and sober in his habits, for as much as twelve months while so at large on parole."

Section 2 declares that "no person so confined shall be eligible to be paroled or entitled to the provisions of this act until he shall have served the minimum term of imprisonment provided by law for the crime for which he was so committed, except prisoners committed for life, who shall have actually served five years; nor unless he shall have been obedient to the rules and regulations of the institution in which he is confined for at least nine consecutive months next preceding the date of his parole; nor until he shall have secured, or there shall have been secured for him, some respectable employment with some responsible person or concern at a compensation sufficient to render him self-sustaining, and which shall be evidenced by written contract guaranteeing at least six months continuance of the same.   *   *   *."

When the act thus provides that no person shall be eligible to parole except on certain conditions, it necessarily means that those who comply with the conditions shall be eligible to parole. The act, therefore, defines who shall be paroled and does not commit to the commissioners arbitrary power, but imposes on them the duty to parole the prisoners whom the act declares eligible to parole, and this duty the board of prison commissioners may be required in a proper state of case to perform.

Manifestly the standard fixed by these sections is so unmistakable in meaning and specific in character, as to enable the convict to know what his conduct must be to entitled him to the parole or discharge, and also to enable the board to know what will entitle him to either.

It will be further observed that the act in question nowhere gives the board any power to nullify the action of the court in which the conviction of the prisoner was had; in any event, he must endure the minimum of imprisonment as fixed by the court and undergo the labor incident thereto, before the board can parole or discharge him. It cannot imprison him beyond the maximum limit fixed by the judgment of the court, but may parole or discharge him before the maximum limit is reached, dependent, however, upon his conforming his

life and conduct to the standard fixed for entitling him to such parole or discharge.

A judgment inflicting punishment under this act, although a general one, is not rendered uncertain or indefinite because the prisoner may be paroled or discharged by the board before the maximum limit of imprisonment is reached; the fact that it must under the judgment continue for the minimum term and cannot exceed the maximum term, demonstrates the definiteness of the judgment. Any uncertainty in the extent of the punishment after the minimum limit is passed does not arise from uncertainty in the judgment or the statute, but from the uncertainty of the prisoner's conduct. In other words, if his conduct conforms to the standard of good behavior, fixed by the statute, his imprisonment will not continue to the end of the maximum term, but will end at a point somewhere beyond the minimum term and short of the maximum, when his conduct shows such conformity to the statutory standard as to entitle him to be discharged.

The act also provides that its provisions shall not in any way interfere with the power conferred upon the Governor of the State by the Constitution, to pardon or commute the punishment of persons convicted of crime.

Statutes similar in meaning, and some of them in practically the same language, have been enacted in many of the states, and while the courts of last resort in two or three of these states have declared the acts unconstitutional, like courts of a majority of them, have upheld their validity. State v. Peters, 43 Ohio, 629; Murphy v. Commonwealth, 52 N. E., 505; Oliver v. Oliver, 169 Mass., 592; Commonwealth v. Brown, 167 Mass., 144; George v. State, 167 Ill., 447; State v. Page, 60 Kan., 664; People v. Warden Sing Sing Prison, 78 N. Y., 907.

There is abroad in the land a sentiment demanding that a more humane policy shall be adopted in dealing with those confined in penal institutions; indeed, the problem of prison reform has engaged the profound consideration of legislatures, congresses, and humanitarians generally, covering a period of many years, resulting in investigation and the securing of facts and statistics for the enactment into laws of such reforms as appear to be needed for the moral uplift of those convicted of crime; and the acts before us but embody, in

some measure, in their terms, the crystalized thought of the best minds upon this subject of absorbing interest.

We do not mean to say that the act in its present form is perfect, for it is not, but its defects will doubtless be remedied by further legislation and it is not in our opinion justly open to the criticisms made upon it in the brief of appellant's counsel.

Appellant's final contention that he should have been granted a new trial because of the alleged newly discovered evidence presented to the court below by affidavits is without merit. In one of the affidavits it is stated that affiant's knowledge of the wound upon appellant's hand, which the latter claimed was inflicted by deceased in jerking from him the stick with which it is alleged he tried to strike him, was seen by him immediately after the homicide was committed, or on the same day. The other two affidavits were with respect to threats claimed to have been made by deceased against appellant shortly before and on the day of. the homicide All this evidence was merely cumulative. Such threats having been established by other witnesses and the wound upon appellant's hand by his own testimony, and perhaps that of another, on the trial. What appellant said to the witness about the wound would be incompetent as evidence. It is also apparent that this evidence might with any sort of diligence on appellant's part, have been discovered in time to have introduced it on the trial; therefore, no error was committed in refusing a new trial on this ground.

For the reasons indicated the judgment is affirmed.

Whole court sitting.