## Strong v. Commonwealth.

(Decided October 15, 1926.)

### Appeal from Breathitt Circuit Court.

1. Homicide.—Evidence held sufficient to submit question of defendant's guilt to jury and to sustain conviction for voluntary manslaughter.

2. Hearing preliminary examination of wtiness as to competency of dying declaration in jury's presence held not reversible error, where it rendered declaration competent.

3. Homicide.—Admission of statement in dying declaration that defendant's weapon looked like a Luger pistol, though a conclusion, held not prejudicial in prosecution for murder.

4. Homicide.—Admission of statement as to age of deceased, made in dying declaration, though irrelevant held not prejudicial in prosecution for murder.

5. Homicide.—Statement in dying declaration that deceased was doing "nothing" when killed held admissible in prosecution for murder, where he stated facts on which he reached such conclusion.

6. Criminal Law.—Testimony to show general reputation for truth and veracity or morality of witness may never be introduced by Commonwealth as substantive testimony.

7. Witnesses.—Testimony showing reputation for peace and quietude may not be introduced to impeach credibility of witness.

8. Homicide.—Admission of substantive testimony that defendant's reputation for peace and quietude was bad held improper in murder qase, where he had not attempted to prove that it was good.

9. Criminal Law.—After conviction for voluntary manslaughter, in which defendant claimed he shot at decedent's brother in self-defense, newly discovered evidence that such brother had threatened to kill defendant held to warrant new trial, such evidence not being cumulative because it proved collateral fact.

JOHN D. CARROLL, JOHN S. CARROLL, W. L. KASH and A. S. JOHNSON for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHAS. F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE THOMAS— Reversing.

The appellant, Brown Strong, at his trial in the Breathitt circuit court under an indictment charging him with murdering George Watts, was convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of seven years. His motion for a new trial was overruled, and from the judgment rendered on the verdict he prosecutes this appeal, relying upon a number of alleged errors as grounds for a reversal, but the only two which we deem of sufficient merit to require our consideration are: (1), The admission of incompetent testimony offered by the Commonwealth, and (2), newly discovered material evidence for defend-

ant which the court held insufficient to authorize a new trial.

Before taking up the discussion of either of those grounds a brief statement of the substance of the testimony is deemed necessary. The killing occurred late in the afternoon of May 26, 1925, on a public road paralleling and running near to one fork of the Kentucky river at a point where John Little's creek empties into it and not far from the post office of Whick, a railroad station. In the early part of the afternoon the deceased, his brother, Kelly Watts, and Bob Noble were fishing in the river near the mouth of the creek and having no success they concluded to go upstream to a point beyond the residence of Dan Fugate, and in doing so they passed by the residence of defendant, who was in a nearby field and carrying with him a shot gun. He was spoken to by the three and invited by some of them to take a drink of liquor with which they appear to have been plentifully supplied. He accepted the tendered hospitality and besides taking a drink he filled from the container, in the possession of the three, a half-pint bottle and returned to his house "for a few minutes." The fishing party went on and became engaged in conversation with Dan Fugate at his residence and concluded to engage in no more fishing and started down the road on the return trip when they met defendant going from his house toward Fugate's on his horse. He soon returned and overtook the fishing party near the front of his residence and invited them to go in and have supper, which they declined, he in the meantime having eaten his supper. The deceased and his brother, Kelly Watts, were on one horse, the latter riding behind, and he said, while on the witness stand, that when defendant overtook them on his return from Fugate's he said: "I have got more nerve than any man in Breathitt county. Look what I have done; been shot here, had my whole jaw took out and that didn't put me to sleep." The witness thus recites the occurrences immediately preceding and at the time of the homicide: "We went down about a quarter of a mile below his house. I was riding behind and had my hand on my thigh this way. He pulled his horse's reins back and says, 'Kelly, you have had your hand on your pistol all evening,' I says, 'Brown, you are mistaken, I have no pistol.' He says, 'You are a God damned liar, you have.' And throwed his leg over the saddle and hit the ground and he caught me by the

coat and jerked me off. I caught by my left hand on his shoulder and went on the ground with this hand, got hold of a rock and I raised; he was jobbing me with his pistol; I knocked the pistol off and he struck me in the head; I struck at him with the rock and hit him in the head or somewhere, I don't know where I hit him, but I struck at him three or four licks, and my brother says, 'Kelly, quit racketing and let's go on home.' I says, 'All right.' My brother got off his horse and come walking down the road with his hands by the side of him and Brown went off below in a little bushes and I heard a gun fire and turned and my brother throwed his head back that way. I run to him. I don't know how many shots was fired. I says, 'Are you killed?' He says, 'Yes, I am killed.' He was coming with his pistol, had his pistol in his hind pants pocket and bringing her kindly up that way and fired one shot, and when he done that I grabbed the pistol and says, 'Give me that quick,' and he jerked it over this way and says, 'I am not going to do it.' I grabbed at her again and he says, 'Brown Strong has killed me; let him go; don't hurt him.' '' The admitted dying declaration of the deceased (the competency of which was objected to, thus raising a question to be hereinafter determined) corroborated the testimony of Kelly Watts in some of the material features as to what occurred immediately at the scene of the killing.

The defendant stated that he had been at work on his farm that afternoon and later went squirrel hunting near his residence and was returning when he first saw the Watts boys and their companion, Bob Noble. He admits going to the road where they were and taking a drink, but denied filling a bottle for himself, and stated that it was done by him for one of the party and at the latter's request, since he was too drunk to pour the liquor from the container into the bottle. According to his testimony he returned to his house and from thence went to Dan Fugate's to engage the latter to drop corn the next day, when he met the party returning near Fugate's house; that he did not get off his horse but made the engagement with Fugate to work for him the next day and started back towards his home, overtaking the fishing party about the time they arrived in front of his house and invited them to eat supper; that they declined, and he went into his house to get a sack with which he intended to procure some seed corn from a neighbor down the road

by the name of Short; that after doing so he started down the road and overtook the three, Noble riding alone on his horse some distance behind the Watts brothers, who, as before stated, were riding one horse; that he rode a short distance by the side of Noble, who dropped behind, and he then rode his horse by the side of the one ridden by the Watts brothers. He then said: "I rode down and Kelly took me by the back of the neck and pulled me off my horse backward; never was a word said no way; when he pulled me off the horse backwards he struck me in the face." Q. "With what?" A. "Knife, and the next lick he struck me in the back of the head, and about the time he struck at me, I am not sure, four or five licks, I dodged one or two I knocked off, and I shot at him." He then stated that he was cut in two places on the head before he fired the shot at Kelly Watts, and that he did so in what he in good faith believed was his necessary self-defense. It was then practically dark, and he went to the house of a Mr. Deaton, and he proved by its inmates that he was cut, bruised and bleeding at the time, and he exhibited the scars to the jury at the trial. Noble rather corroborated defendant in some of the material points of the latter's testimony; while some other material facts to which Kelly Watts testified as occurring at that time were not observed by Noble. All parties agree that there had been no disturbance or friction of any kind up to the time immediately preceding the killing, and defendant claims not to have seen George Watts at the time he fired his pistol at Kelly; nor did he know that the former had gotten off the horse upon which he was riding. But it seems that he had, and that he in some manner had also gotten behind Kelly and within range of defendant's pistol when he fired it, as he said, at Kelly. It is, therefore, obvious that with the sharp contradiction in the testimony, as we have briefly outlined, it can not be said that the evidence was insufficient to submit the issue of defendant's guilt to the jury, nor that it was insufficient to sustain the verdict returned, and we will now proceed to a discussion of the two relied on grounds hereinbefore stated.

1. Under this ground it is complained, (a), that the court erroneously admitted the dying declaration of the deceased, and (b), that it was also error for the Commonwealth to introduce as substantive testimony the reputation of defendant for peace and quietude. The dying

declaration complained of under division (a) was testified to by the prosecuting witness, P. F. Adams, a minister of the gospel residing at Jackson, Kentucky, who was sent for by the deceased from a hospital in that town to which he had been carried. The declaration was written by the witness and was obtained through an examination of the deceased by him in the form of questions and answers, and as testified to it was: "What is your name? A. George Watts. Q. Where do you live? A. At Whick, Kentucky, on John Little's creek. Q. Is that in this county, Breathitt? A. Yes, sir. Q. How old are you? A. I will be 23 on the 10th day of July. Q. How are you hurt? A. Shot. Q. By whom were you shot? A. Brown Strong. Q. With what were you shot? A. Looked like to me it was a Luger pistol. Q. What were you doing at the time you were shot? A. Nothing; we were coming down the road riding, me and Brown Strong, Kelly Watts and Bob Noble, and Brown and Kelly had a few words and I think Kelly hit Brown over the head with his pistol. I said, 'Boys, don't do that,' and jumped off my mare and just as I jumped off Brown shot me. Q. Where was Brown when he shot you? A. Below the road in the bushes. Q. Did you have a pistol? A. Yes, sir. Q. Where was your pistol at the time you were shot? A. It was in my pocket. Q. Did you at any time draw your pistol before you were shot? A. No. Q. Did you draw your pistol after you were shot? A. Yes, sir. Q. Did you fire your pistol? A. I don't know for sure, but I think I fired one shot after I was shot; I was lying on the ground at the time I shot." It is insisted that the testimony of the witness upon the question of the competency of the dying declaration, *i. e.*, whether or not it was made *in extremis* so as to render its introduction competent, was had in the presence of the jury, which was improper, as held by us in the case of Burnett v. Commonwealth, 172 Ky. 397, and the preceding cases of Commonwealth v. Johnson, 158 Ky. 579, and Wilson v. Commonwealth of Ky., 141 Ky. 341. In those cases the court merely outlined the proper practice by saying: "In determining whether evidence of a dying declaration is competent, it is undoubtedly the safer practice for the court to hear it in advance of its introduction before the jury and in their absence, in order that they may get no impression from it that would be prejudicial to the defendant, if the court should rule it incompetent and reject it." It was not held in either of the cases that if the

preliminary examination, though heard before the jury, was such as to render the declaration competent it would be a reversible error. There was nothing in such testimony in this case that could possibly be prejudicial to defendant's rights, and the only part of it that was objected to was the answer of defendant identifying the writing containing the questions and answers embodying the entire declaration. It is, therefore, obvious that this point is without merit.

But counsel object that the answer in the declaration, "Looks like to me it was a Luger pistol," was but a conclusion of the declarant; but even so, it was wholly immaterial and equally nonprejudicial. Objection is also made to the statement in the declaration of the age of deceased, which, perhaps, was irrelevant but not fatal to the entire declaration, nor prejudicial to defendant's substantial rights. Objection is also made to the word "nothing" as employed in the answer of deceased to the question, "What were you doing at the time you were shot?" If that was the entire answer, under numerous prior opinions rendered by us, the objection would be fatal, but the answer in full was: "Nothing; we were coming down the road riding, me and Brown Strong, Kelly Watts and Bob Noble, and Brown and Kelly had a few words and I think Kelly hit Brown over the head with his pistol; I said, 'Boys, don't do that,' and jumped off my mare and just as I jumped off Brown shot me," which stated the facts upon which the declarant concluded that he was doing nothing at the time, and the jury could have understood the answer as a whole in no other light. So considered, we conclude that under our former opinions, excluding declarations which merely said that the declarant was doing nothing at the time he was fatally injured, do not apply and that defendant's rights were not prejudiced, although the correct practice would have required the striking out of the word "nothing" as a part of the answer if a motion had been made for that purpose. It, however, was not done, since the objection to the introduction of the declaration, as well as the motion to strike it, went to its entirety. We, therefore, conclude that complaint (a) is without merit.

Complaint (b) under this ground presents a more difficult question. In the absence of a statutory rule to the contrary three traits of character, provable by general reputation, may be investigated as affecting the

main issue in litigation, but such testimony is more frequently introduced in rebuttal to affect the credibility of a witness or a party if he has testified as a witness, than as substantive testimony. Those three traits which may be proved by general reputation are: (1) For truth and veracity; (2), for morality, and (3), for peace and quietude, and it is the failure of text writers and courts, in their formation of the correct rule of practice, to distinguish between the three that has produced some confusion and also produced what clearly appears to be an illogical position in denying the introduction of substantive testimony on the third trait by the prosecution to prove the bad reputation for peace and quietude of the the defendant when the nature of the issues being investigated involves it. It is the universal law that testimony to prove traits numbers (1) and (2) may never be introduced by the Commonwealth as substantive testimony. It is equally well settled that the character involved in the third cassification may not be introduced to impeach the credibility of a witness, including a defendant testifying for himself in a criminal prosecution, since that trait of character has no bearing on the truthfulness or the veracity of the witness. Notwithstanding that distinction the text books and opinions, including those of this court, in discussing the admissibility of character testimony and the circumstances under which it may be introduced, coincide with the text in Bishop's New Criminal Procedure, volume I, subsection 2 of section 1112, which says: "The doctrine is, that the defendant is presumed to be innocent; and his character to be, at least, of ordinary goodness. When this presumption is met by the prosecuting power with *prima facie* evidence of guilt, he may bring forward in defense his good character; in rebuttal whereof, yet not otherwise, it may be shown against him to be bad." The two domestic cases of Montgomery v. Commonwealth, 17 K. L. R. 94, and McDonald v. Commonwealth, 86 Ky. 10, are cited in support of that text, and every one rendered by us since then is in accord with the same statement. But an examination of them will show that in each of them, one or both of the two traits of character in classifications (1) and (2), *supra,* were involved; and the question: Whether it would be competent for the Commonwealth to introduce, as substantive testimony, the defendant's bad character for peace and quietude, was not presented in either of them.

An equally well established rule is stated in the text of 30 C. J. 229, paragraph 465, thus: "Where there is evidence tending to show self-defense or the character of the transaction is in doubt the reputation of deceased for being a violent and dangerous character can be shown for the purpose of showing a reasonable apprehension of immediately impending danger on the part of defendant." Domestic cases endorsing that rule of criminal practice are Ware v. Commonwealth, 140 Ky. 534; Riley v. Commonwealth, 94 Ky. 266, and Brown v. Commonwealth, 10 Ky. Opinions 375. If, therefore, such character evidence as to the *deceased* is thus made competent as *substantive* testimony on behalf of defendant for the purpose of showing (in the character of cases to which it applies) who was the aggressor in the difficulty, it would seem to follow that the same character of testimony as to the general reputation of the defendant would likewise throw light on the same issue, and the courts of Alabama and Arkansas so held in the cases of Cook v. State, 5 Ala. A. 11, 59 So. Rep. 519, and Carr v. State, 147 Ark. 524. We, however, have been unable to find any text writer on criminal law adopting the rule as so announced by the courts of those states; nor has this court done so in any opinion that we have been able to find. The reason for rejecting it seems to be, that the *deceased* is not on trial and the jury can not be led astray so as to do him harm by the introduction of the testimony as to *his* character; but to admit its introduction as against the defendant on trial would possibly result in miscarriages of justice by inducing the jury to convict him because of his general bad reputation for peace and quietude rather than because of his guilt of the offense on trial. The general law allowing the introduction of testimony to prove defendant's reputation for peace and quietude when introduced as substantive testimony in his behalf is stated in 30 C. J., *supra,* page 235, paragraph 471, but a part of it says: "But evidence of defendant's character for honesty and integrity is not admissible, and in the absence of evidence for defendant raising an issue as to the reputation for violence it is held that the prosecution can not introduce evidence as to defendant's reputation for the purpose of showing who was the aggressor, although there is evidence of a violent act of deceased resisted by defendant." In conformity with that text we held in the Montgomery case, *supra,* and in the subsequent one of

Calhoon v. Commonwealth, 23 K. L. R. 1188, that it was improper for the Commonwealth to prove as substantive testimony the bad reputation of the defendant for peace and quietude upon his trial under a charge of murder when his plea was self-defense, which is the exact case as the one now before us. We, therefore, are constrained to hold that the court in this case improperly admitted the substantive testimony offered by the Commonwealth to the effect that the defendant's reputation for peace and quietude was bad, since he had not attempted to prove that it was good; nor was such testimony only impeaching in its nature as it did not bear upon his credibility as a witness. If he had attempted to establish his good reputation for the qualities mentioned no doubt it would have been competent for the Commonwealth to have introduced its witnesses in rebuttal of that testimony, but to be followed by an admonishment of the court as to its purpose.

2. The deceased and his brother resided near the line between Breathitt and Perry counties. After the trial defendant, as manifested by his affidavit, discovered three witnesses who did not testify on the trial and who resided in Perry county; one of whom was a constable and who a short while prior thereto had arrested Kelly Watts for having whiskey in his possession. The affidavits of those three witnesses were filed with the motion for a new trial and they disclose that Kelly Watts, not long before the homicide, and at or after the time he was arrested, expressed the opinion that the defendant, Brown Strong, in some manner procured his arrest, and also two or three prior arrests, and that he threatened Strong by saying: "He was going to kill Brown Strong the first time he got a chance." That "he and Brown Strong could not both live in the same country together and that he would kill him." There was no testimony of any threats introduced or offered to be introduced at the trial, and the testimony of the three discovered witnesses can in no sense be said to be cumulative. Because it proves a collateral fact which tends to establish the main issue of guilt or innocence does not render it cumulative within the rule disallowing new trials for newly discovered evidence which is only cumulative.

In the case of Mullins v. Commonwealth, 185 Ky. 326, we said in the opinion while discussing the same question: "If it (the newly discovered evidence) is directed

toward the establishment of a collateral fact or circumstance, about which no testimony had been introduced, but which bears upon the principal fact, it is not necessarily cumulative. Waller v. Groves, 20 Conn. 305; Albert v. Meritt, 16 Ia. 121; Schlenker v. Risley, 38 Amer. Dec. 100; 29 Cyc. 908-9; I. C. R. Co. v. Wilson, 31 K. L. R. 789. These authorities in substance hold that evidence which brings to light some new and independent truth of a different character, although tending to prove the same principal proposition or claim, is not cumulative within the rule now under consideration. Especially so if the collateral or independent fact or circumstance would likely be of controlling influence with the jury.'' We, therefore, conclude that the alleged newly discovered evidence in this case was not cumulative within the rule disallowing it; and it is obvious that it might be of controlling influence with the jury, in view of the fact of the contradictory nature of the testimony as to who was the aggressor at the time of the homicide here involved. See Johnson v. Commonwealth, 188 Ky. 391. Due diligence was shown by defendant, and the failure to discover the testimony of the three witnesses residing in Perry county may not be said to be due to a failure to exercise it.

We, therefore, conclude that, for the reasons stated, the judgment is erroneous and it is reversed, with directions to grant the new trial and for proceedings consistent herewith.