# Nolan v. Commonwealth.
(Decided Nov. 22, 1935.)

A. T. W. MANNING and L. C. LITTLE for appellant.

BAILEY P. WOOTTON, Attorney General, and WILLIAM A. SHUMATE, Jr., Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

On January 9, 1935, the grand jury of Jackson county returned an indictment against the appellant, Fred Nolan, charging him with the murder of Wash Hensley, and, on his trial thereunder, he was convicted of the crime of voluntary manslaughter and his punishment fixed at imprisonment for twenty-one years.

In the motion and grounds made for a new trial, some twelve assignments of error were made. Two of the alleged grounds therein recited are by defendant's counsel here expressly abandoned in brief, as being without merit. Some of the ten remaining grounds, by reason of their close connection and similarity, are argued together, thus presenting but six grounds now in-

sisted upon for reversal, which are: (1 and 2) That the statement of the deceased made shortly before his death, "Boys, they killed me for nothing. I wasn't doing anything," etc., was incompetent and its admission as a dying declaration, over objection of defendant, highly prejudicial, as representing but the expression of opinion by the deceased, rather than the relation of any fact or circumstance connected with the cause and occurrence of the homicide; grounds 3 and 4 attack the alleged statement of defendant's father, made to the arresting officers, in the absence of the defendant, that he and the accused were not at Sand Gap, the place the tragedy occurred, as incompetent either as substantive or rebuttal testimony, and allege the court's error in permitting its introduction was not cured by the court's admonition to the jury, restricting its consideration of the father's testimony to only the one purpose of discrediting (if it did) his credibility as an adverse witness; (5) that the arrest and imprisonment during the trial of a witness for appellant on the charge of false swearing, whose testimony contradicted that of the commonwealth's main witness, was improper and highly prejudicial to appellant; and (6) that misconduct of the commonwealth's attorney in arguing before the jury certain parts of the testimony offered as a dying declaration, which were ruled out and excluded by the court as incompetent, was reversibly prejudicial to the appellant.

Before undertaking the discussion and disposition of these points, we will, for their clearer consideration, first give a brief summary of the facts and circumstances surrounding the admitted shooting and killing of the deceased, Wash Hensley, at Hensley's coal mine in Jackson county, by the appellant, Fred Nolan, on the late afternoon of November 9, 1934, while disputing over Hensley's selling price, per ton, of coal.

It is shown by the evidence that the appellant, Fred Nolan, together with his younger brother, Johnnie, and father, L. M. (Buddy) Nolan, came to the coal mine of the deceased shortly after dark upon this occasion for the purpose of buying a truck load of coal for resale; that appellant in the prosecution of his coal peddling business, it is disclosed, worked with or for his father, L. M. Nolan, whose truck he used in hauling and delivering to purchasers the coal as bought and resold by him. It further appears that on the evening of No-

vember 9, 1934, he drove to the deceased Hensley's mine, at Sand Gap, Jackson county, Ky., upon such a mission, accompanied by his father and brother, where, upon their arrival, he first inquired of some employees there as to what was their ton price of coal. One of them, E. G. Miller, replied $2.35 per ton, to which appellant answered that he could and had recently bought such coal at another nearby mine at $2.25 per ton, to which Miller replied that, as he might be mistaken as to the price, he would call the mine owner and manager, Mr. Hensley, to come and himself price the coal to him, which was done. Hensley, upon joining them at the coal pile, was asked the ton price of his coal, and answered $2.35; to which Nolan replied: "We will not take any. We will go to No. 3 mine and get coal for $2.25. We can get it down there for that."

Appellant testifies that Hensley became enraged by this statement and called him "a g. d. liar" and said that he couldn't buy coal there at that price. Appellant then told him that he had bought coal there the last week for $2.25, to which the deceased answered: "You are another g. d. liar. I will cut your g. d. head off," and grabbed at him with his left hand, while striking at him with a knife held in his right hand; that appellant dodged, drew his gun, and shot Hensley as he grabbed at him the second time, when "Hensley went down"; that he then turned and, with his father and brother, hurriedly crowded into the truck and left. Further he testifies that he fired only this one shot at Hensley, and that was done to save his life, when he was cutting at him with a knife.

E. G. Miller, the appellant, Fred Nolan, his father, L. M. Nolan, and younger brother, Johnny Nolan were the only ones, other than the deceased, present at the place and time this dispute over the price of coal arose and was had between the deceased and accused and the only eyewitnesses to the facts and circumstances of the appellant's admitted shooting and killing of Hensley, which then and there took place.

The appellant's brother and father, who at the time of the shooting stood only a few feet away, testify in corroboration of the appellant, that he was, when he shot Hensley, being attacked with a knife by him.

In denial and contradiction of this theory of appellant's defense, based upon such version of his shooting

and killing Hensley, is the counter testimony of the prosecuting witness, Miller, who testifies that the deceased, Wash Hensley, was upon this occasion called by him from his home, down to the coal pile, for the purpose of telling the appellant the price of his coal, and that he, upon being asked this question by appellant, had answered it was worth $2.35 a ton, to which the appellant replied, "the old man had been getting it for $2.25 a ton;" that "a dispute then arose between them about the 10-cent difference per ton, in which one word brought on another; that they disputed one another's word about it, until Nolan shot Hensley"; that "Hensley, when shot, was standing, with his hands in his pockets, about eight feet away from Nolan"; that after shooting him, the Nolans never said a word, but "got into the truck as quickly as they could crowd into it, and left as fast as they could get the truck to go"; that he (the witness) didn't know who they were, nor did the Nolans give or tell "any names they claimed to go by." Miller further states that while the deceased was lying near the coal pile, where he had fallen when shot, he said "he was killed" and "to take good care of his children. and never expressed any hope of recovery."

The wife of the deceased, by way of also contradicting appellant's testimony, that Hensley was attacking him with a knife when he shot him, testifies that almost immediately after the shooting, she hurried to where her husband was lying wounded at the mine, but that she neither saw nor found any knife either on or near him.

The evidence for the commonwealth is further that soon after Hensley was shot, he was placed in a truck and carried to the Berea Hospital for medical attention, and that while on the way the witness Browning testifies that the deceased made the following dying statements to him and others there accompanying him: "Boys, they killed me for nothing. I wasn't doing anything." "That they had some little difference, and that the dispute was over a dime on the ton of coal." And again said: "Oh lordy, boys, I am killed. They killed me for nothing. I didn't expect him to shoot me, but I am killed." And "that he was shot on surprise, that he didn't think the fellow would shoot him."

The court, after hearing this testimony outside the hearing of the jury, as was proper (Wilson v. Commonwealth, 141 Ky. 341, 132 S. W. 557), as to Hensley's

statements made as to appellant shooting him, ruled that same was admissible as his dying declaration, with the exception of his one statement that, "they shot me for nothing," as his other statements were, under the conditions and circumstances shown to exist when spoken by him, declarations of fact, which concerned and were restricted to the act and cause and circumstances attending the commission of the homicide and formed a part of the res gestæ, when made by him, as found, under the belief of his impending death which fact may be determined by circumstances, and need not be expressed in words declaring he is about to die. But as to the statement, "They shot me for nothing," the court ruled it was not competent as a statement of fact, restricted to the act of killing, and should be excluded and that it was not to be considered by the jury for any purpose, as same was but the expression of a conclusion by him.

Appellant's criticism and complaint of this ruling of the court is, we conclude, without merit, as same we conceive to be in harmony with our repeated enunciations as to what must be the scope and character of evidence to be admissible as a dying declaration—that evidence is competent as such only where it would be competent if given by a living witness. Philpot v. Commonwealth, 205 Ky. 636, 266 S. W. 348. For further statements of this rule, defining dying declarations and the limitations thereon, compare the cases of Hunter v. Commonwealth, 221 Ky. 170, 298 S. W. 379; Strong v. Commonwealth, 216 Ky. 98, 287 S. W. 235; Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176; Mann v. Commonwealth, 215 Ky. 731, 286 S. W. 1044; Jackson v. Commonwealth, 189 Ky. 68, 224 S. W. 649; Commonwealth v. Belcher, 255 Ky. 475, 74 S. W. (2d) 955; Griffin v. Commonwealth, 204 Ky. 783, 265 S. W. 327; Bradley v. Commonwealth, 204 Ky. 635, 265 S. W. 291; Engle v. Commonwealth, 258 Ky. 118, 79 S. W. (2d) 417; Reno v. Commonwealth, 258 Ky. 166, 79 S. W. (2d) 692.

Appellant next complains that his rights were prejudiced by reason of the court's alleged error in permitting the officers who arrested his father to testify, in contradiction of him, that he had stated to them (upon their arrest of him and in the absence of the appellant) that neither he nor the appellant nor his brother were present at the Sand Gap mine on the evening

Hensley was killed, and that they knew nothing about the killing, and to thus impeach his very contradictory testimony given in chief that he was present when his son, the appellant, shot the deceased, and that he shot in self-defense.

Appellant contends that while the trial court admonished the jury with respect to this rebutting testimony, impeaching the statement of the father made in appellant's absence, the same did not serve to correct the prejudice caused by the court's error in allowing its alleged improper admission, in that the testimony of the arresting officer was introduced and intended to impeach and contradict the credibility of the father's evidence when it related, not to a material, but only to a collateral, issue.

It may be conceded, as a well-established rule, that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence and discrediting his testimony in case he denies the fact. Hayden v. Commonwealth, 140 Ky. 634, 131 S. W. 521; Southern R. Co. v. Jones, 172 Ky. 8, 188 S. W. 873; Babey v. Commonwealth, 169 Ky. 735, 185 S. W. 81; Cincinnati, N. O. & T. P. R. Co. v. Prewitt's Adm'r, 203 Ky. 147, 262 S. W. 1; Loving v. Commonwealth, 80 Ky. 507; Foure v. Commonwealth, 205 Ky. 62, 265 S. W. 443.

In Miller v. Commonwealth, 241 Ky. 818, 45 S. W. (2d) 461, 462, this rule was thus again stated:

"A witness may be asked on cross-examination any proper question which may affect the weight of his testimony or his credibility."

There the question asked witness was as to whether he and the wife of appellant were together near the home of Linville Miller or elsewhere on the evening or night before the killing, which was not an issue to be tried by the jury, but was purely a collateral question, to which, even if its asking were permissible for affecting his credibility, his answer would be conclusive, and it was held not proper to permit it to be rebutted.

However, the propriety of allowing the contradiction of the witness in the instant case is clearly distinguishable in principle from that applied in holding it improper in the Miller Case, supra, in that here the impeachment of the witness by contradiction of his an-

swers did not relate to questions asked him only as to a matter collateral to the issue to be tried, but they were related to a matter directly involved in the issue before the jury as to whether or not the appellant killed the deceased, Hensley, in self-defense, as to which the witness sought to be impeached had testified that he was present and an eyewitness to the killing of Hensley by his son and that same was done by him in his self-defense. For the purpose of affecting the credibility of this material evidence of an adverse witness, directly bearing upon the one issue to be tried by the jury, as to appellant's justification for his admitted killing of Hensley, his testimony was properly subject to impeachment, as here permitted, for discrediting it.

The appellant next complains that his rights were prejudiced by reason of the arrest and imprisonment of his witness Rockie during the trial, serving to discredit the witness and very adversely affect the credibility of his testimony, most materially pertinent to the issue before the jury and most potent to influence its verdict. However, sufficient answer to this objection, we conclude, is made by the trial court's order made in overruling this ground set out in his motion and grounds for a new trial, where the court, in passing upon this ground urged for a new trial, states that this witness Rockie testified upon the trial on a very material point, contradicting the commonwealth's main witness, Miller; that thereafter the witness remained in the courtroom, and if placed under restraint during the progress of the trial it was unknown to the court; that after the argument of the case was closed and the case submitted to the jury and the jury had been sent out of the room, under proper admonition, in custody of their guard, the commonwealth's attorney moved the court to hold the witness Rockie under bond, to answer any indictment that might be returned against him for false swearing; that the court sustained the motion and placed the witness in the custody of the jailer; and that therefore the court was of the opinion that no substantial rights of the defendant were prejudiced by reason of what was done.

In this conclusion we concur, for the very sufficient reason that certainly appellant cannot meritoriously contend that his witness was discredited in the minds of the jury by reason of the occurrence of some alleged

prejudicial matter which took place during the absence of the jury and about which they knew nothing.

The next and final objection urged for reversal, and which we regard as decidedly the most serious error relied on by appellant, relates to the alleged improper argument of the commonwealth's attorney made in closing the case.

Appellant's complaint as to this, as set out in his bill of exceptions, is that the commonwealth's attorney, in his closing argument of the case, used the following language:

> "I call Wash Hensley from the grave and through the mouth of the witness, Browning, he tells you, 'I was standing there and he shot me for nothing. I was doing nothing and did not expect him to shoot.' And again I say to you this is the testimony of the dead and coming to you from the grave."

To this argument the appellant at the time objected and, upon same being overruled, excepted.

It will be noted that the ground of the objection to this argument is that by it the commonwealth, it is contended, improperly sought to bring to the attention of the jury, for the inflaming of its mind against appellant, the exact evidence which the court had ruled was incompetent and should be excluded and not considered by the jury for any purpose whatsoever.

We have repeatedly severely criticized attorneys for the commonwealth for going outside the record or for referring to or attempting to reargue material evidence that the court has excluded, and it is now scarcely necessary to repeat what we have so often said concerning the argument counsel for the commonwealth may make without subjecting his argument to the censure of improper conduct.

In the case of Slaughter v. Commonwealth, 149 Ky. 5, 147 S. W. 751, 753, the court, in there discussing the alleged misconduct of the attorney for the commonwealth, based upon a like alleged instance of improper argument, said:

> "He [the commonwealth's attorney] is clothed with great power and speaks with the authority of the

state, and juries ought to and do give great weight to his statements as the representative of the people, whose duty it is to use every legitimate effort to vindicate the law and bring to justice persons who violate its mandates. Armed with this power and authority, and speaking as a sworn officer of the commonwealth, he should only ask that justice be done between the commonwealth and the accused; and this plea he should make in the deliberate, dispassionate manner becoming an officer holding so responsible a place, and not seek by extravagant and reckless statements to inflame the passion and prejudice of the jury. As said in Keeton v. Commonwealth, 108 S. W. 315, 32 Ky. Law Rep. 1164: 'The commonwealth's attorney is a sworn officer of the law. Upon him the primary duty of conducting the prosecution is imposed. * * * It is his duty to see that the legal rights of the accused as well as those of the commonwealth are fully protected. * * * He is never the instrument of vengeance. He should never attempt to secure a conviction at all hazards.' "

In our opinion, this melodramatic argument, resorted to by the commonwealth's attorney as a means for bringing before the jury, in violation of the court's prior ruling, evidence which it had emphatically excluded, was altogether improper and to be condemned as an instance of flagrant misconduct on the part of the offending attorney, who by such improper methods attempted to secure a conviction at all hazards.

We are unable here to determine what weight this improper argument made by the commonwealth's attorney had with the jury, but it may well be that it contributed in no small degree to induce it to return the verdict of conviction which it did.

Impressed with the force of appellant's contention, both as to the court's error in permitting this improper argument of evidence before it, which it had excluded, as well as the misconduct of the offending attorney in presenting it, we are led to conclude that by reason thereof the accused did not have the fair trial to which he was entitled and are constrained to award the appellant the right to another trial, wherein these errors we deem reversibly prejudicial we trust may not again occur.

Wherefore, the judgment is reversed for proceedings consistent with this opinion.