COMMONWEALTH of Kentucky, ex rel. Attorney General Jack CONWAY, Appellant,

v.

LaDonna H. THOMPSON (in her Official Capacity as Commissioner of Kentucky Department of Corrections), Appellee.

and

LaDonna H. Thompson (in her Official Capacity as Commissioner of Kentucky Department of Corrections), Appellant,

v.

Honorable David A. Tapp (Judge, Pulaski Circuit Court) and Commonwealth of Kentucky, ex rel. Commonwealth's Attorney Eddy F. Montgomery (Real Party in Interest), Appellees.

Nos. 2009–SC–000107–TG, 2009–SC–000252–TG.

Supreme Court of Kentucky.

Nov. 25, 2009.

As Corrected Jan. 4, 2010.

Franklin Todd Lewis, Executive Director, Office of the Attorney General, Office of Special Prosecutions, Jeanne Deborah Anderson, Executive Director, James Hays Lawson, Janet Marie Graham, Lisa Kathleen Lang, Tad Thomas, Assistant Attorney Generals, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellant/Appellee, Commonwealth of Kentucky, ex rel. Attorney General Jack Conway and Commonwealth of Kentucky, ex rel. Commonwealth's Attorney Eddy F. Montgomery (Real Party In Interest).

Joseph Todd Henning, Vickie L. Wise, General Counsel, Wesley Warden Duke, Justice and Public Safety Cabinet, Office of Legal Services, William Henry Fogle, Deputy Executive Director, Office of Legal Services, Frankfort, KY, Counsel for Appellee/Appellant, LaDonna H. Thompson (in her Official Capacity as Commissioner of Kentucky Department of Corrections).

Judge David Austin Tapp, Pulaski Circuit Court, Somerset, KY, for Appellee

Honorable David Austin Tapp (Judge, Pulaski Circuit Court).

Eddy Frank Montgomery, Office of Commonwealth's Attorney, Somerset, KY, for Appellee Commonwealth's Attorney Eddy F. Montgomery (Real Party in Interest).

## OPINION AND ORDER

### I. INTRODUCTION.

In April 2009, the Pulaski Circuit Court granted a permanent injunction prohibiting the Department of Corrections (DOC) from releasing any prisoner from custody or parolee from supervision "as a result of any change caused or occasioned by the retroactive application of House Bill [HB] 406 [the 2008–10 biennial budget]." Four months later, the Franklin Circuit Court refused the Kentucky Attorney General's request for a temporary injunction, which would have temporarily enjoined the DOC from implementing HB 406 in an allegedly retroactive manner.

Because of the apparent disagreement between the two circuit courts concerning the effect of HB 406 and because these cases present issues of great and immediate statewide importance, this Court granted transfer from the Court of Appeals of both the DOC's petition for a writ of prohibition against the Pulaski Circuit Court and the Attorney General's appeal of the Franklin Circuit Court's refusal to grant a temporary injunction. After careful consideration, we grant the writ against the Pulaski Circuit Court and affirm the Franklin Circuit Court's denial of a temporary injunction.

1. 2008 Ky. Acts ch. 127.

2. "Street credit," also known as "street time," is a colloquial term referring to count-

### II. FACTUAL AND PROCEDURAL HISTORY.

The relevant facts of the two underlying cases are largely the same and appear to be uncontested. In 2008, the Kentucky General Assembly enacted HB 406, the Commonwealth's biennial budget; and Governor Beshear signed it into law. Part I, Section I(5)(c)(4)-(5) of HB 406 [1] drastically altered the law regarding whether time spent on parole would count toward a prisoner's unexpired sentence, providing that:

> (4) **Probation and Parole Credit:** Notwithstanding KRS 439.344, the period of time spent on parole shall count as a part of the prisoner's remaining unexpired sentence when it is used to determine a parolee's eligibility for a final discharge from parole as set out in subsection (5) of this section or when a parolee is returned as a parole violator for a violation other than a new felony conviction.

> (5) **Minimum Expiration of Sentence:** Notwithstanding KRS 439.354, a final discharge shall be issued when the prisoner has been out of prison on parole a sufficient period of time to have been eligible for discharge from prison by minimum expiration of sentence had he not been paroled, provided before this date he had not absconded from parole supervision or that a warrant for parole violation had not been issued by the board.

In this manner, HB 406 gave rise to "street credit," that effectively suspended the existing statutory law that had provided that the period of time spent on parole would not count toward a prisoner's maximum sentence.[2] Indeed, the then-existing

ing time spent on parole toward a prisoner's sentence. See 67A C.J.S. Pardon & Parole § 90 (2009).

version of Kentucky Revised Statutes (KRS) 439.344 said just the opposite: "The period of time spent on parole shall not count as a part of the prisoner's maximum sentence except in determining [a] parolee's eligibility for a final discharge from parole as set out in KRS 439.354."[3]

Believing it to be in accordance with the General Assembly's intent, the DOC began applying HB 406 to award street credit to prisoners for time spent on parole before HB 406's effective date. As of November 2008, approximately 1,562 prisoners had been released from prison under HB 406; and approximately 2,135 parolees had been finally discharged from parole at their minimum expiration dates.[4]

Dissatisfied with the DOC's application of HB 406, in August 2008, Eddy Montgomery, the Commonwealth's Attorney for the 28th Judicial Circuit of Kentucky,[5] filed a petition for a declaratory judgment and injunction against LaDonna Thompson, in her official capacity as Commissioner of the Kentucky Department of Correc-

tions. In short, Montgomery's action sought to prevent the DOC from retroactively applying HB 406.

At the Commonwealth's Attorney's instance, the Pulaski Circuit Court issued a restraining order in August 2008, followed by a temporary injunction in September 2008, each of which prevented Thompson from retroactively applying HB 406 either to release any prisoner from custody or to grant a final discharge to any parolee. Both the temporary injunction and the restraining order were limited to prisoners or parolees in the DOC's custody by virtue of a judgment entered in the 28th Judicial Circuit.

Although he had notice of the Commonwealth's Attorney's pending Pulaski Circuit Court action, the Attorney General declined to intervene in that suit. Instead, in October 2008, the Attorney General filed a strikingly similar action in the Franklin Circuit Court against Commissioner Thompson.[6] In his complaint, the Attorney General asked the Franklin Cir-

---

3. As will be discussed later, the General Assembly amended KRS 439.344 in 2009. The current version of that statute provides that:

 The period of time spent on parole shall count as a part of the prisoner's sentence, except when a parolee is:
 (1) Returned to prison as a parole violator for a new felony conviction;
 (2) Classified as a violent offender pursuant to KRS 439.3401; or
 (3) A registered sex offender pursuant to KRS 17.500 to 17.580.

4. As explained by the Pulaski Circuit Court, a prisoner's maximum expiration date "is the date at which one's sentence would expire if served in its entirety without the benefit of any good time credit, i.e., it is the longest period one could possibly be kept in prison pursuant to a lawful sentence...." By contrast, as the Pulaski Circuit Court explained, a prisoner's minimum expiration date is "the maximum expiration date less any 'good time credit' for which an offender is eligible. It is the date at which an offender would be released from incarceration if he or she were in

custody serving his or her sentence and credited with 'good time credit....'"

5. The 28th Judicial Circuit of Kentucky is comprised of Lincoln, Pulaski, and Rockcastle Counties. KRS 23A.202(28).

6. The Pulaski Circuit Court denied the DOC's forum non conveniens-based motion to dismiss or transfer the case to the Franklin Circuit Court. Because it is not necessary in order to decide these appeals, we express no binding opinion on the propriety of the Pulaski Circuit Court's denial of the motion to transfer.

 Also, we question whether it was procedurally proper for the Attorney General to file a second action in the Franklin Circuit Court raising the same issues against the same governmental entities involved in the pending Pulaski Circuit Court action. Cf. 1A C.J.S. Actions § 226 (2009) ("The rule against splitting a cause of action is for the protection of the defendant, and serves to prevent a multiplicity of suits and appeals

cuit Court "to enjoin statewide the Department of Corrections . . . from continuing to release prisoners pursuant to its early release program." In December 2008, despite the fact that the Pulaski Circuit Court had already issued a temporary injunction based upon the same facts, the Franklin Circuit Court denied the Attorney General's request for a temporary injunction. The Attorney General appealed that decision, asking the Court of Appeals to grant relief under Kentucky Rules of Civil Procedure (CR) 65.07.[7]

Meanwhile, the Pulaski Circuit Court case moved forward. In April 2009, the Pulaski Circuit Court issued a declaratory judgment and permanent injunction permanently prohibiting the DOC "from releasing from custody any prisoner currently incarcerated within a correctional institution of this state, and from granting a final discharge to any person now subject to parole supervision, as a result of any change caused or occasioned by the retroactive application of House Bill 406."[8] Unlike the temporary injunction and restraining order that preceded it, the permanent injunction was not limited to

prisoners and parolees serving sentences imposed by the 28th Judicial Circuit Court. Since the permanent injunction did not contain language making it a final and appealable order,[9] Commissioner Thompson filed a petition for a writ of prohibition with the Court of Appeals, seeking to prevent the Pulaski Circuit Court from enforcing its injunction.

We granted transfer of both the Attorney General's appeal of the Franklin Circuit Court's denial of a temporary injunction and of the DOC's petition for a writ of prohibition against the Pulaski Circuit Court. We have elected to resolve both appeals in this combined opinion.

## III. ANALYSIS.

### A. Standards of Review.

Since they are in different procedural postures, the standards of review are different for the Attorney General's appeal from the Franklin Circuit Court than for the DOC's petition for a writ of prohibition against the Pulaski Circuit Court.

### 1. The Writ Standard.

■ We may issue a writ if:

with respect to a single cause of action. It is designed to promote fairness to the parties by protecting defendants against fragmented, harassing, vexatious, and costly litigation, and the possibility of conflicting outcomes.") (footnotes omitted). But we need not decide if the Attorney General's Franklin Circuit Court complaint should have been dismissed because the DOC has not raised that issue.

7. CR 65.07(1) provides, in relevant part, that "[w]hen a circuit court by interlocutory order has granted, denied, modified, or dissolved a temporary injunction, a party adversely affected may within 20 days after the entry thereof move the Court of Appeals for relief from such order."

8. To some extent, the Pulaski Circuit Court's injunction came too late because thousands of prisoners and parolees had already been giv-

en final discharges; and the Attorney General stated at oral argument that it was not asking this Court to order the re-arrest of those discharged prisoners and parolees. Nevertheless, this case is not entirely moot because other prisoners and parolees have not been, and will not be, released or discharged if the Pulaski Circuit Court's permanent injunction stands.

9. The Pulaski Circuit Court did not intend the permanent injunction to bring an end to Montgomery's action because the permanent injunction stated, "[a]ll further issues are reserved pending further proceedings." Because it appears that the main issues before that court were resolved by the declaratory judgment and permanent injunction, it is unclear what further proceedings the Pulaski Circuit Court contemplated. Regardless, we accept for purposes of this writ proceeding that the case was not ripe for direct appeal.

(1) the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2)[ ] the lower court is acting or is about to act erroneously, although within its jurisdiction, and there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.[10]

The DOC does not contend that the Pulaski Circuit Court acted outside its jurisdiction when it issued an injunction.[11] So our focus is on the second type of writ classification.

■ A writ is an extraordinary remedy that should be issued only in exceptional circumstances.[12] And we have ruled that the requirement that a writ may issue only if a petitioner lacks an adequate remedy by appeal is "absolute."[13] In other words, a writ may not issue "unless the petitioner can demonstrate that traditional post hoc appellate procedures do not provide him or her with an adequate remedy."[14] But the irreparable injury requirement is not as absolute. A court may grant a writ without a showing of irreparable harm "provided a substantial miscarriage of justice will result if the lower court is proceeding erroneously, *and* correction of the error is necessary and appropriate in the interest of orderly judicial administration."[15] Issuance of a writ in those rare situations is really a court's recognition that "if it fails to act[,] the administration of justice generally will suffer the great and irreparable injury."[16]

## 2. The Temporary Injunction Standard.

■ The proceedings in the Franklin Circuit Court are not final. So it is important to remember that "[a] motion for a temporary injunction does not call for, or justify, an adjudication of the ultimate rights of the parties."[17] Rather, a temporary injunction should issue "only where it is clearly shown that one's rights will suffer immediate and irreparable injury pending trial."[18] In other words, a temporary injunction is of a limited scope and duration and is proper "only where absolutely necessary to preserve a party's rights pending the trial of the merits."[19] A temporary injunction should not issue in "doubtful cases...."[20]

■ A court faced with a request for a temporary injunction must analyze the request on three levels.

First, the trial court should determine whether plaintiff has complied with CR

10. *Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky. 2004).

11. As will be discussed later, the DOC does contend that the Pulaski Circuit Court lacked jurisdiction to issue a statewide injunction. But arguing about the proper scope of an injunction is not the same as arguing that a court lacked the inherent jurisdiction to issue an injunction.

12. *See, e.g., Fletcher v. Graham*, 192 S.W.3d 350, 356 (Ky.2006).

13. *Adventist Health Systems v. Trude*, 880 S.W.2d 539, 541 (Ky.1994), *overruled on other grounds by Sisters of Charity Health Systems, Inc. v. Raikes*, 984 S.W.2d 464 (Ky.1998).

14. *Flynt v. Commonwealth*, 105 S.W.3d 415, 422 (Ky.2003).

15. *Bender v. Eaton*, 343 S.W.2d 799, 801 (Ky. 1961).

16. *Id.*

17. *Oscar Ewing, Inc. v. Melton*, 309 S.W.2d 760, 761 (Ky.1958).

18. *Maupin v. Stansbury*, 575 S.W.2d 695, 698 (Ky.App.1978).

19. *Id.*

20. *Id.*

65.04 by showing irreparable injury. This is a mandatory prerequisite to the issuance of any injunction. Secondly, the trial court should weigh the various equities involved. Although not an exclusive list, the court should consider such things as possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo. Finally, the complaint should be evaluated to see whether a substantial question has been presented. If the party requesting relief has shown a probability of irreparable injury, presented a substantial question as to the merits, and the equities are in favor of issuance, the temporary injunction should be awarded. However, the actual overall merits of the case are not to be addressed in CR 65.04 motions.[21]

■■■ Because the granting or denial of a temporary injunction under CR 65.04 is "addressed to the sound judicial discretion of the trial judge[,]"[22] a party seeking interlocutory relief from a trial court's decision to grant or deny a temporary injunction bears an "enormous burden...."[23] And an appellate court may not disturb a trial court's decision on a temporary injunction unless the trial court's decision is a clear abuse of discretion.[24] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[25]

### B. A Writ of Prohibition Is Proper in this Case.

The first question to be asked in the writ case is whether the trial court erred

by concluding that the DOC was improperly applying HB 406. After all, there would be no basis to issue a writ if the trial court had jurisdiction and came to a proper conclusion. So our primary task by application of the writ standard is to determine whether the trial court erred when it concluded that the DOC improperly applied HB 406 retroactively.

Before addressing the merits, we must resolve two important preliminary questions. First, we must determine whether the Pulaski Circuit Court had jurisdiction to issue a statewide injunction. Second, we must determine whether the DOC is actually applying HB 406 in a retroactive manner.

### 1. The Pulaski Circuit Court had Jurisdiction to Issue a Statewide Injunction.

■■■ No party disputes that the Pulaski Circuit Court had the subject matter jurisdiction to entertain this type of declaratory judgment or injunctive relief case. The DOC argues, however, that the Pulaski Circuit Court lacked the authority to issue a statewide injunction. We disagree.

Section 109 of Kentucky's Constitution assures that Kentucky has a unitary court system. Section 109 states that all "judicial power of the Commonwealth shall be vested exclusively in one Court of Justice[,] which shall be divided into a Supreme Court, a Court of Appeals, [and] a trial court of general jurisdiction known as the Circuit Court.... The court shall constitute a unified judicial system for operation and administration." We have recent-

21. *Id.* at 699.

22. *Oscar Ewing, Inc.,* 309 S.W.2d at 762.

23. *Kindred Hospitals Ltd. Partnership v. Lutrell,* 190 S.W.3d 916, 919 (Ky.2006).

24. *Oscar Ewing, Inc.,* 309 S.W.2d at 762.

25. *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

ly held that "[c]onstitutionally speaking, Kentucky has but one circuit court[;] and all circuit judges are members of that court and enjoy equal capacity to act throughout the state." [26]

The DOC appears to contend that only the Franklin Circuit Court has the power to issue a statewide injunction. We do not doubt that the Franklin Circuit Court, generally speaking, has such authority; but the jurisdiction of the Franklin Circuit Court is not at issue. No party has cited any statute or regulation that required this type of action to have been brought only in the Franklin Circuit Court. The lack of such authority is important because the General Assembly could easily have required this type of action to be brought in the Franklin Circuit Court, as it has done in other types of actions. [27] Instead, the General Assembly expressly authorized any "court of record of this Commonwealth having general jurisdiction" to issue a declaratory judgment. [28] And, as already noted, the circuit courts of the Commonwealth, including the Pulaski Circuit Court, are the courts of "general jurisdiction. . . ." [29] Although it now questions the Pulaski Circuit Court's authority to issue a statewide injunction, the DOC does not contradict the Pulaski Circuit Court's statement that "Thompson has conceded that both jurisdiction and venue are proper."

In sum, we have a situation in which the Pulaski Circuit Court had jurisdiction, either expressly or by waiver, over both the subject matter and the parties involved in this action. Also, there is no question regarding whether venue was proper since, as stated before, the DOC conceded any venue issue. Perhaps most importantly, we have been pointed to nothing that would have required this action to have been brought in the Franklin Circuit Court. [30] To the contrary, it is plain that our Constitution provides that there is only one circuit court, which leads to the logical conclusion that in the absence of express authority to the contrary, each geographic division of the one statewide circuit court has co-equal abilities and powers.

Additionally, it seems that Commonwealth's Attorney Montgomery would not have been able to bring this action in his official capacity in any court lying outside the circuit from which he was elected. [31] So we conclude that the Pulaski Circuit Court had powers co-extensive with the

---

26. *Baze v. Commonwealth*, 276 S.W.3d 761, 767 (Ky.2008).

27. *See, e.g.*, KRS 44.020(2) (providing that the Franklin Circuit Court has "exclusive jurisdiction of all actions against the Governor's Office for Local Development to compel the payment of claims against the State Treasury.").

28. KRS 418.040 ("In any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights, whether or not consequential relief is or could be asked.").

29. Ky. Const. § 109.

30. We recognize that permitting each circuit court to issue a statewide injunction could lead to inconsistent results between judicial circuits, as exemplified by the case at hand. The remedy for that unfortunate possibility, however, lies with the General Assembly.

31. *See, e.g.*, *Thompson v. Carr*, 13 Bush 215, 76 Ky. 215, 1877 WL 7650 at *4 (1877) ("The office of commonwealth's attorney being created by the constitution, and that instrument requiring the office to be filled by popular election in each judicial, i.e. circuit court district, that officer when elected must perform his duties in the district by which he was elected, and the legislature can neither authorize nor require him to go outside of it, unless they may do so by changing his district at the first session after an enumeration or when a new district is established."); KRS

Franklin Circuit Court or any other appropriate circuit court to adjudicate this matter and to grant a declaratory judgment or injunction, statewide or otherwise.[32]

### 2. The DOC is Applying HB 406 Retroactively.

▇▇▇▇▇ An argument could be made that the DOC did not apply HB 406 retroactively. Instead, as the Franklin Circuit Court seemed to conclude, the DOC merely applied HB 406 equally to all affected prisoners or parolees because the bill contains no express exclusions or limitations on the prisoners or parolees to which it applies.[33] However, all parties (including the DOC) seem to agree that the DOC is

---

69.010(1) ("Except as provided in subsection (2) of this section, the Commonwealth's attorney shall, except in Franklin County, attend to all civil cases and proceedings in which the Commonwealth is interested *in the Circuit Courts of his judicial circuit.*") (emphasis added).

> Because it has not been raised by the parties as an issue, we express no opinion as to whether Commonwealth's Attorney Montgomery's position gave him a special status to file this type of action over and above the status of any citizen of this Commonwealth. But we do note that by agreed order, the Pulaski Circuit Court case was re-captioned to reflect that the plaintiff was the Commonwealth of Kentucky, *ex rel* Eddy Montgomery. So, like the Franklin Circuit Court case, the named plaintiff in the Pulaski Circuit Court was the Commonwealth of Kentucky, not merely Montgomery as an individual.

**32.** We note the concern expressed by the Franklin Circuit Court and the DOC that some of the real parties in interest in this matter—the prisoners potentially affected by HB 406—are not before the Court in either the Pulaski or Franklin Circuit Court actions. Arguably, since the proper calculation of their sentences is directly affected by HB 406, all potentially affected prisoners and parolees should have been joined as parties in the action since they appear to have "an interest relating to the subject of the action[s] and ... [are] so situated that the disposition of the action in ... [their] absence may ... impair or impede ... [their] ability to protect that interest...." CR 19.01. But for logistical and other reasons it is not practical to make all potentially affected prisoners and parolees parties to these actions. And since the potentially affected prisoners and parolees presumably received their sentences from the circuit courts across the Commonwealth, it would be very difficult—perhaps even impossible—for each to have properly appeared in any one circuit court without a class action.

> Since the DOC and Thompson—who collectively are directed to supervise probation and parole under KRS 196.030(1)(b), to supervise correctional facilities, and to determine the minimum and maximum release dates of prisoners under KRS 196.070(1)— are properly before the Court by waiver or otherwise and are taking a position ultimately favorable to the prisoners and parolees, we conclude that these actions may proceed, especially since the prisoners and parolees will suffer no prejudice from their absence because the outcome of these appeals is favorable to them. *See* CR 19.02 (setting forth factors to consider when determining whether an action should be dismissed due to the absence of persons who should have been joined as parties, including "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties....").

**33.** The Attorney General contends or implies that the DOC erred by applying HB 406 to murderers, sexual offenders, and violent offenders. But there is no language in HB 406 that would permit the DOC to refuse to apply its terms to any group of prisoners or parolees—other than the narrow exception that parolees returned to prison as parole violators for receiving new felony convictions shall not receive credit for time spent on parole. Neither we—nor the DOC—may take it upon ourselves to write exceptions into a statute. *See, e.g., Jones v. Commonwealth*, 279 S.W.3d 522, 526 (Ky.2009) ("a longstanding rule in this Commonwealth prohibits a court from judicially creating and grafting exceptions onto a statute when the General Assembly did not see fit to do so."). But HB 406 does not expressly supersede the more stringent treatment afforded sexual or violent offenders, such as the mandate in KRS 439.340(11) that

applying HB 406 retroactively.[34] And since HB 406 is a biennial budget bill, effective for only a two-year time period, then it logically follows that giving prisoners or parolees credit for time spent on parole before the effective date of that legislation is a retroactive act. BLACK'S LAW DICTIONARY defines a *retroactive law* as "[a] legislative act that looks backward or contemplates the past, affecting acts or facts that existed before the act came into effect."[35] Giving prisoners and parolees credit for time served on parole before the effective date of HB 406 fits nicely that definition since giving prisoners and parolees credit for something done before the act's effective date plainly "affect[s] acts or facts that existed before the act came into effect." So we shall treat the DOC's interpretation of HB 406 as being retroactive in nature.

### 3. *It is Proper to Apply HB 406 Retroactively.*

Having accepted that the DOC is applying HB 406 retroactively, we must now consider whether such a retroactive application is consistent with the intent of the General Assembly, as evidenced by the language used in HB 406.

### a. *Estoppel Not Applicable.*

 We reject Montgomery's contention—as echoed by the Attorney General in the Franklin Circuit Court action—that the DOC is procedurally barred or estopped from retroactively applying HB 406 since it argued against retroactive application of the similar biennial budget enacted in 2003.[36] To the contrary, an ad-

---

sexual offenders not be granted parole unless they have successfully completed the sexual offender treatment program or the mandate in KRS 439.3401(3) that violent offenders sentenced to a term of years for capital, Class A, or Class B felonies not be released on probation or parole until they have served at least 85 percent of their sentences. By contrast, the General Assembly expressly precluded violent offenders and registered sex offenders from receiving credit for time spent on parole as part of their sentences in the current version of KRS 439.344(2)-(3).

Similarly, we reject any argument that a retroactive application of HB 406 was improper because the prisoners and parolees released would tend to—or did—re-offend. Obviously, recidivism is a risk inherent in the release of any prisoner at any time; but we have been shown nothing that proves that the prisoners or parolees released "early" by the DOC's application of HB 406 pose a greater danger to the citizens of this Commonwealth than prisoners and parolees released under other circumstances. As the Franklin Circuit Court noted, "[n]o evidence has been presented to show that inmates released early under HB 406 are re-offending at a greater rate than the historical recidivism rate for inmates prior to implementation of the 'early release' policy under HB 406." Moreover, the General

Assembly has expressed in HB 406 that the public policy of the Commonwealth is, for the two-year duration of that legislation, for prisoners and parolees to receive "street credit." Whether that policy is wise is a matter reserved for the legislature, not the courts. *Owens v. Clemons*, 408 S.W.2d 642, 645 (Ky.1966) ("the legislature, when it acts upon a particular subject matter, establishes such policy. . . . It is beyond the province of a court to vitiate an act of the legislature on the ground that the public policy therein promulgated is contrary to what the court considers to be in the public interest. . . . The propriety, wisdom and expediency of statutory enactments are exclusively legislative matters.").

**34.** The DOC has not taken issue with the Pulaski Circuit Court's statement in its temporary injunction order that "[DOC] stipulated that the 'good time' provision of HB 406 is being applied retroactively."

**35.** BLACK'S LAW DICTIONARY (8th ed.2004).

**36.** *See, e.g., Noland v. Dept. of Corrections*, 266 S.W.3d 249, 251 (Ky.App.2008) (rejecting prisoner's claim that the biennial budget passed in 2003, containing similar "notwithstanding KRS 439.344" language, meant that prisoner was entitled to declaratory judgment

ministrative agency, such as the DOC, may depart from its earlier interpretation of the law, provided that the agency "explicitly and rationally justif[ies] such a change of position." [37]

▆▆▆ In the case at hand, the DOC has not changed its interpretation of the same law because, even though they are similar, the 2003 biennial budget is a different piece of legislation from the 2008 biennial budget. It should also be noted that the gubernatorial administration, which has a direct effect on the officers leading the DOC and the positions taken by those officers, was different at the time the 2003 budget was enacted. It is hardly surprising or improper for different gubernatorial administrations to have different conclusions on the proper scope and effect of various statutes—even statutes of a similar nature. In short, each administration or administrative agency chief is not inalterably bound by the decisions of predecessors.

And even if we assumed that the DOC has changed its interpretation of the law, we are satisfied that the change has been sufficiently justified because, as the DOC notes, there was no commensurate budgetary reduction to support a retroactive application of the 2003 biennial budget. So we distinguish this case from those cases, such as *Noland*, which held that the DOC acted properly in not applying the 2003 budget bill retroactively. In short, we re-

ject any claim that the DOC's interpretation of the 2003 budget bill binds it or estops it from interpreting differently the 2008 budget bill.

#### b. *General Principles of Retroactivity.*

▆▆▆ Precedent shows that the General Assembly has the power to suspend statutes, even if the suspension occurs in a budget bill.[38] Precedent also holds that the General Assembly has the power to suspend statutes retroactively.[39] The question before us today, then, is not whether the General Assembly may retroactively suspend statutes in a budget bill, typically by inserting a clause beginning with the word *notwithstanding*. The more pertinent question is whether the General Assembly intended to suspend KRS 439.344 and KRS 439.354 retroactively when it enacted HB 406. If so, the DOC obviously acted properly in giving HB 406 retroactive application; and the Pulaski Circuit Court erred in issuing an injunction to stop the DOC from carrying out the General Assembly's intent. If not, however, then the Pulaski Circuit Court acted properly in preventing the DOC from acting in a manner contrary to the General Assembly's intent.

We have held that retroactive application of statutes is improper unless the General Assembly "clearly manifests its intent" for the statute in question to have retroactive application.[40] And although we

ordering the DOC to credit time spent on parole against prisoner's sentence because the prisoner's parole "was revoked before the provisions of [HB] 269 became effective, [meaning] he is unable to avail himself of their ameliorative effect on his sentence['s] length.").

**37.** *In re Hughes & Coleman*, 60 S.W.3d 540, 544 (Ky.2001).

**38.** *Baker v. Fletcher*, 204 S.W.3d 589, 592 (Ky.2006) ("It is beyond dispute that the Gen-

eral Assembly possesses power to suspend statutes.... Prevailing precedent of this Court provides that the General Assembly may also suspend statutes in a budget bill.").

**39.** *Id.* ("Moreover, the General Assembly may *retroactively* suspend statutes in some circumstances....").

**40.** *Id.* ("Moreover, the General Assembly may *retroactively* suspend statutes in some circumstances, provided that the legislature clearly manifests its intent to do so.").

have held that the General Assembly need not use "magic words"[41] to evidence its intent for retroactive application, we have forcefully held that "there is a strong presumption that statutes operate prospectively and that retroactive application of statutes will be approved only if it is absolutely certain the legislature intended such a result."[42]

■ Optimally, the General Assembly will state clearly that it intends legislation to have retroactive effect, as it did in 1996 when it amended the worker's compensation statutes.[43] The question is more difficult in cases like the one before us in which the General Assembly does not explicitly state that HB 406 must apply retroactively. But a failure to state explicitly that legislation is to apply retroactively does not always mean that a court may not determine that the legislation has retroactive effect. After all, the General Assembly need not use "magic words"—instead, all that "is required is that the enactment make it apparent that retroactivity was the intended result."[44] So a reviewing court may discern the General Assembly's intent for legislation to have a retroactive effect by using traditional tools for statutory interpretation. Among the most helpful aids in interpreting HB 406 is a budgetary analysis, such as the one found in *Baker.*

### c. *Baker.*

*Baker* involved a scenario in which the General Assembly had failed to enact a biennial budget in 2002, leading then-Governor Patton to issue an executive spending order. That executive order provided for a 2.7 percent annual salary increment for state employees, the fact that KRS 18A.355(1) guaranteed state workers at least a 5 percent annual salary increment notwithstanding.[45] In 2003, the General Assembly belatedly enacted a biennial budget for the fiscal year beginning July 1 2002, through June 30, 2004. Like Governor Patton's executive order, that budget provided for a 2.7 percent salary increment for state workers for the 2002–03 fiscal year. Several state workers filed a declaratory judgment action against Ernie Fletcher, who had become Governor, arguing that they were entitled to a 5 percent salary increment for 2002–03 because Governor Patton lacked the authority to suspend KRS 18A.355.[46] We held that Governor Patton's purported suspension of KRS 18A.355 was void *ab initio* and that members of the General Assembly were immune for their official actions (or inactions).[47]

Despite those seemingly insurmountable obstacles to the plaintiffs' claims against then-Governor Fletcher, we, nonetheless, chose to address "whether Appellants would have been entitled to the five percent pay increase even if a proper defendant had been named."[48] In the course of answering that question in the negative,

41. *Id.* at 597 ("Though it is clear that the General Assembly must expressly manifest its desire that a statute apply retroactively, magic words are not required."). *See also* KRS 446.080(3) ("No statute shall be construed to be retroactive, unless expressly so declared.").

42. *Commonwealth Dept. of Agriculture v. Vinson,* 30 S.W.3d 162, 168 (Ky.2000).

43. *See* KRS 342.0015 (providing, in pertinent part, that "[t]he provisions of KRS 342.120(3), 342.125(8), 342.213(2)(e),

342.265, 342.270(3), 342.320, 342.610(3), 342.760(4), and 342.990(11) are remedial.").

44. *Baker,* 204 S.W.3d at 597.

45. *Id.* at 591.

46. *Id.* at 591–92.

47. *Id.* at 593–97.

48. *Id.* at 597.

we concluded that there was "no doubt" that the General Assembly intended to suspend KRS 18A.355 retroactively for the duration of the 2002–04 biennial budget.[49] Chief among our reasons was the fact that the budget contained explicit language providing for a retroactive suspension of KRS 18A.355.[50] Important to the case at hand, however, we also noted that our conclusion that the General Assembly intended to suspend retroactively KRS 18A.355 was "confirmed by the actual amount of money appropriated. The General Assembly appropriated just enough to pay a two and seven-tenths percent raise for all employees.... Where a sum certain is appropriated[,] there can be no legitimate contention that more spending was intended." [51]

### d. *Application of Baker.*

██ Turning to the case now before us, by using *Baker* as a guidepost, we may properly look to the funds appropriated to the DOC in HB 406 to determine whether the General Assembly intended HB 406 to apply retroactively.

It is uncontested that the funds allocated to the DOC were significantly reduced from the budget request submitted by the Governor.[52] Indeed, as the Pulaski Circuit Court noted in its permanent injunction, the "final version of HB 406 [that] was ultimately enacted included a $12 million budget cut in fiscal year [2008–09] and a $19 million budget cut in fiscal year [2009–10]...." The "street credit" provisions were in the original budgets of both chambers of the General Assembly, and were "not altered in any manner by subsequent amendments or alterations to the proposed budgets of each chamber...." Upon request of the Senate leadership, the state budget office, assisted by the DOC, submitted a financial analysis showing the anticipated savings resulting from the street credit provision of the proposed budget, including nearly $6 million in fiscal year 2008–09 and nearly $7.5 million in fiscal year 2009–10. It is uncontested that those calculations required retroactive application of the street credit provision to realize the proposed savings.[53]

It is abundantly clear from the facts and circumstances surrounding the passage of HB 406, therefore, that the General Assembly wanted the DOC to save as much money as is legally feasible. Also, the numbers presented by the DOC and the state budget office to the General Assembly regarding potential savings from a broad application of the street credit provisions were based upon an expectation that those provisions would be applied retroactively.

██ Unlike the Pulaski Circuit Court, we find it inconsequential that the

---

49. *Id.*

50. *Id.*

51. *Id.*

52. As the Pulaski Circuit Court noted, "[t]he initial budget proposed by the House [of Representatives] contained significant budget cuts to [the DOC] when compared to the sums requested in the branch budget. The initial proposed Senate budget also reflected significant budget cuts when compared to [the DOC's] portion of the branch budget...."

53. Both the Pulaski and Franklin Circuit Courts made similar findings on this issue. The Pulaski Circuit Court found in its final injunction that "the calculations prepared by [the DOC] require retroactive application to justify the projected costs savings...." The Franklin Circuit Court found in its order denying the Attorney General's request for a temporary injunction that "[t]he budget cuts imposed by the legislature on DOC were consistent with the numbers [the DOC] submitted to the legislative budget committees for costs savings resulting from the broad application of the 'street time' credit."

General Assembly members apparently did not make in-depth inquiries about whether the savings provisions were to apply retroactively or that the projected savings calculations were not provided to each member of the General Assembly.[54] Nor is our decision affected by the lack of floor debate about street credit provisions in both legislative chambers. The General Assembly speaks through the laws it enacts, and the severe budget cuts contained in HB 406 speak loudly the General Assembly's intent that the DOC should strive to save as much as possible. Moreover, the DOC's decision to apply the street credit and related provisions of HB 406 retroactively is not rendered infirm by the fact that the Executive Branch, of which the DOC is a part, could theoretically have saved just as much—if not more—scarce resources if the Governor had simply exercised his constitutional pardon and commutation powers.[55] In other words, since the General Assembly appropriated even less money than the DOC projected to save through the retroactive application of the street time credit,[56] then "there can be no legitimate contention that more spending was intended."[57]

### e. *Other Factors Support Retroactivity.*

The DOC's retroactive application of HB 406 is also supported by the plain language used in that bill.[58] HB 406 authorizes street credit for "time spent" on parole. Obviously, "spent" is a past-

**54.** Apparently, at least a small percentage of the members of the General Assembly were told by Deputy State Budget Director John Hicks that the DOC intended to achieve cost savings by applying HB 406 retroactively. So it cannot be said that the General Assembly was taken totally unawares by the DOC's intent to apply HB 406 retroactively. We cannot interpret a statute based upon sheer speculation as to what was—or may have been—in the minds of the legislators at the time the statute was enacted.

**55.** *See* Ky. Const. § 77 (providing that the Governor "shall have power to remit fines and forfeitures, commute sentences, grant reprieves and pardons...."). Since the street credit provisions are not the same as gubernatorial pardons or commutations of sentences, we reject any argument that HB 406 violates Section 77 of the Kentucky Constitution.

Interestingly, although elected independently of the Governor, the Attorney General is also a member of the Executive Branch. *See* 7A C.J.S. *Attorney General* § 29 (2009) ("The attorney general's office is a branch of the executive department of state government and not a legislative or judicial branch of the government."). So the Franklin Circuit Court case brought by the Attorney General against Thompson and the DOC is an intra-Executive Branch dispute. In that same vein, even though also elected independently of the Governor, since the Commonwealth's Attorney is "the chief prosecutor in the circuit court," *Commonwealth v. Euster*, 237 Ky. 162, 35 S.W.2d 1, 2 (1931), and "[i]t is manifest that the prosecution of crime is an executive function[,]" *Flynt*, 105 S.W.3d at 424, then Montgomery is also a member of the Executive Branch. Accordingly, Montgomery's Pulaski Circuit Court action against Thompson and the DOC is also an intra-Executive Branch dispute.

**56.** As it turned out, the DOC apparently achieved the projected costs savings in November 2008. But the fact that the retroactive application of HB 406 apparently saved even more than was planned does not affect our conclusion that the General Assembly intended for the DOC to apply HB 406 in a retroactive manner. Nor would achieving the projected savings early in the biennium mean that the DOC should have stopped applying HB 406 retroactively since there is no language in HB 406 to indicate that the General Assembly did not intend for that legislation to apply retroactively for its entire effective lifetime.

**57.** *Baker*, 204 S.W.3d at 597.

**58.** *See, e.g., Lewis v. Jackson Energy Co-op. Corp.*, 189 S.W.3d 87, 92–93 (Ky.2005) (using grammatical structure of statute as interpretive aid).

tense verb; and the General Assembly did not see fit to add any modifying or limiting language (such as "time spent after the effective date of this act") to this facially broad provision. So we agree with the DOC that the plain language of HB 406 supports a conclusion that the General Assembly intended for the street credit provision to apply to all time spent on parole—including time spent on parole before the effective date of HB 406. This conclusion is reinforced by the fact that the General Assembly later amended KRS 439.344 itself to provide that, with certain exceptions, "[t]he period of time spent on parole shall count as a part of the prisoner's sentence...." Had the General Assembly disagreed with the DOC's interpretation of HB 406, it would have been illogical for the General Assembly to have permanently amended KRS 439.344 by inserting similar language to that used in HB 406.

▆▆▆ Finally, we must be careful not to examine HB 406's street credit provision in a vacuum. Rather, we must construe the street credit provision in conjunction with the other sections of that bill. As our predecessor court held, "[s]tatutes in pari materia or those which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose, must be construed together and the legislative intention apparent from the whole enactment must be carried into effect." [59] We conclude that the General Assembly's intent regarding the street credit provision may be gleaned by examining the subsection that immediately follows it.

Part I, Section I(5)(c)(5) of HB 406 provides that "[n]otwithstanding KRS 439.354, a final discharge shall be issued when the prisoner has been out of prison on parole a sufficient period of time to have been eligible for discharge from prison by minimum expiration of sentence had he not been paroled...." [60] So construing the street credit section together with the minimum discharge section leads to the unmistakable conclusion that the General Assembly intended for the DOC to release or discharge as many prisoners or parolees as possible in order to save as many state dollars as possible. Since the most efficacious and logical manner of ensuring maximum savings is to apply retroactively the street credit provision, we conclude that the DOC's retroactive application of HB 406 was in accordance with the General Assembly's intent. After all, it would have been illogical for the General Assembly to have intended a restrictive version of the street credit provision while simultaneously cutting the DOC's funding and ordering the DOC to release prisoners on their minimum expiration dates.

In summary, we conclude that the Pulaski Circuit Court erred when it determined that the General Assembly did not intend HB 406 to have retroactive effect. We then must turn to whether this error is sufficient to rise to the level necessary to grant a writ. [61]

### 4. Application of the Writ Standard.

▆▆▆ Since this is not a no jurisdiction-type of writ action, we must determine

---

**59.** *Milner v. Gibson,* 249 Ky. 594, 61 S.W.2d 273, 277 (1933).

**60.** In 2009, the General Assembly amended KRS 439.354(1) to provide, with some exceptions, parolees are to be given final discharges after reaching their minimum expiration dates.

**61.** *See, e.g., Commonwealth v. Paisley,* 201 S.W.3d 34, 36–37 (Ky.2006) (holding that "demonstration of error does not necessarily entitle" petitioners to a writ unless the standards for granting a writ have been met).

whether the DOC lacks an adequate remedy by appeal.[62] It is unclear what further proceedings remain to be conducted in the Pulaski Circuit Court. But if left undisturbed until appeal, the Pulaski Circuit Court's erroneous interpretation of the retroactivity of HB 406 will have caused many prisoners and parolees to remain improperly under the DOC's supervision, resulting in expenditure of scarce state funds.[63] Since those expended and yet to be expended state funds cannot be recouped and the improperly detained prisoners or parolees cannot regain lost freedom from incarceration or supervision, we conclude that the DOC does not have an adequate remedy by appeal.

Next, we then must determine whether the DOC has shown that either it will suffer an irreparable injury absent the writ or that the failure to issue the writ would result in a substantial miscarriage of justice.[64] As stated before, allowing the Pulaski Circuit Court's erroneous permanent injunction to stand would result in the continued incarceration or supervision of prisoners or parolees, which would, in turn, cause the expenditure of scarce state funds to house or supervise those prisoners or parolees. There would be no mechanism for the DOC to recoup those expenses if it prevailed later on a direct appeal. So we conclude that the DOC has shown that it would suffer an irreparable injury unless a writ issues. Furthermore, we deem it to be a substantial miscarriage of justice for prisoners or parolees to continue to be incarcerated or supervised in a

manner contrary to the intent of the General Assembly, as embodied in HB 406. Simply put, once a prisoner or parolee has completed his authorized sentence, justice demands that the prisoner or parolee be released from the DOC's supervision.

For the foregoing reasons, therefore, we conclude that a writ of prohibition should issue against the Pulaski Circuit Court in this action.

## C. *CR 65.07 Relief is Not Warranted.*

Although we do not express any binding opinion as to the ultimate merits of the Franklin Circuit Court action,[65] application of the foregoing reasoning leads to the conclusion that the Franklin Circuit Court's refusal to issue a temporary injunction was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[66] So we hold that the Franklin Circuit Court did not abuse its discretion when it denied the Attorney General's request for a temporary injunction.

Because many of the issues are the same, we need not repeat our discussion of the issues raised in the Pulaski Circuit Court action. But the parties to the Franklin Circuit Court action have raised four important issues that we must address for the benefit of the trial court and parties to this action, as well as the bench and bar of the Commonwealth in any future similar actions.

First, we must address the Franklin Circuit Court's conclusion, advocated by

---

62. *Hoskins*, 150 S.W.3d at 10.

63. According to the DOC's petition for a writ, 85 people had been denied release as of May 1, 2009. At the expiration of HB 406 next June, over 800 people will have been denied release.

64. *Hoskins*, 150 S.W.3d at 10; *Bender*, 343 S.W.2d at 801.

65. *Oscar Ewing, Inc.*, 309 S.W.2d at 761 ("A motion for a temporary injunction does not call for, or justify, an adjudication of the ultimate rights of the parties.").

66. *English*, 993 S.W.2d at 945.

the DOC on appeal, that the Attorney General lacks standing to seek injunctive relief in this case. Second, we must address the Attorney General's argument that HB 406 violates the truth-in-sentencing law. Third, we must address the Attorney General's argument that retroactive application of HB 406 violates the separation of powers doctrine. And, finally, we must address the Attorney General's argument that HB 406 violates KRS 197.045(1). We reject all four arguments.

### 1. The Attorney General has Standing to Seek an Injunction.

Among the reasons the Franklin Circuit Court declined to issue a temporary injunction was its holding that the Attorney General lacked standing to seek an injunction in this case because the Attorney General did not allege the violation of a personal right. We do not fault the Franklin Circuit Court for reaching that conclusion because it is based upon precedent, *Commonwealth ex rel. Cowan v. Wilkinson.*[67] But, upon reflection, we have concluded that we erred in *Wilkinson* by holding that the Attorney General lacked the ability to seek an injunction in that case because he did not have a "personal right of any kind" in the action.[68]

In the waning days of his administration, then-Governor Wallace Wilkinson appointed himself as a member of the Board of Trustees of the University of Kentucky. The Attorney General sued, and the Franklin Circuit Court granted a temporary injunction prohibiting Governor Wilkinson from taking the oath as a trustee. Wilkinson appealed, and the Court of Appeals dissolved the temporary injunction.[69] The Attorney General then asked the Court to vacate or modify the order of the Court of Appeals. Over the dissent of Justice Leibson, a majority affirmed the Court of Appeals.[70]

In the majority's analysis, it recited the proposition that "[i]n order to demonstrate a right to a temporary injunction, the movant must first allege possible abrogation of a concrete personal right. Some substantial claim to a personal right must be alleged in order for a movant to be entitled to a temporary injunction."[71] The majority then concluded that the Attorney General "has not demonstrated or made a clear showing by affidavit or verified complaint that his rights are being or will be violated so as to cause immediate and irreparable injury."[72] Going further, the majority opined that "[h]ere the Attorney General has no personal right of any kind [in this case]. A doubtful case should await a trial on the merits. This is clearly a very doubtful case as to the standing of the Attorney General."[73]

Having fully considered the law and the arguments of the parties, we now state categorically that we have no doubt that the Attorney General of the Commonwealth of Kentucky has standing to seek injunctive relief on behalf of the citizens of the Commonwealth, as was done in the Franklin Circuit Court case at hand. So, to the extent that *Wilkinson* holds otherwise, it is overruled.

KRS 15.020 provides, in the role as "chief law officer of the Commonwealth of Kentucky[,]" the Attorney General "shall

67. 828 S.W.2d 610 (Ky.1992).

68. *Id.* at 613.

69. *Id.* at 611–12.

70. *Id.* at 616.

71. *Id.* at 612.

72. *Id.* at 613.

73. *Id.*

exercise all common law duties and authority pertaining to the office of the Attorney General under the common law, except when modified by statutory enactment."[74] It is unquestioned that "[a]t common law, [the Attorney General] had the power to institute, conduct[,] and maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights."[75] Or, in other words, "[u]nder the common law, the attorney general has the power to bring any action which he or she thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enforce the state's statutes."[76] So we readily conclude that the Attorney General, by virtue of that office, had the right to file an action in the Franklin Circuit Court seeking injunctive relief to prevent the DOC from, in the Attorney General's view, improperly and unconstitutionally applying HB 406 retroactively.

These bedrock principles of law giving the Attorney General broad powers to initiate and defend actions on behalf of the people of the Commonwealth were overlooked by the majority in *Wilkinson*. Instead, Justice Leibson's dissent correctly recognized:

> It is the Attorney General's responsibility to file suit to vindicate public rights, as attorney for the people of the State of Kentucky. The rights of the people, as the body politic, are identical to the personal rights of a private individual, and enjoy at least the same, if not more, standing to seek a declaratory judgment, and to seek injunctive protection against injury. Under KRS 415.050, the Attorney General may proceed directly against a usurper. Under KRS 15.020, the Attorney General is the state's chief law officer and may "exercise all common law duties and authority pertaining to the office of the Attorney General under the common law." It is the personal right of the people as the body politic and not any personal right of the person holding the office of Attorney General that is being represented here. It is unreasonable to suggest that because the person with the official responsibility to seek protection on the people's behalf has no personal stake in the outcome, there is no right of redress and no right to injunctive relief against the Governor's usurpation of power, if such has occurred.[77]

Accordingly, we overrule *Wilkinson* to the extent that it holds that the Attorney General must have a personal interest in the outcome of the litigation in order to have standing to seek redress. Instead, we now hold that the Attorney General has a sufficient personal right in these types of cases by virtue of the office and the duties commensurate with that high office.[78] There-

74. *See also Commonwealth ex rel. Hancock v. Paxton*, 516 S.W.2d 865, 867 (Ky.1974) (stating that the Attorney General "is possessed of all common law powers and duties of the office except as modified by the Constitution or statutes.").

75. *Id.* (citing 7 Am.Jur.2d *Attorney General* § 6).

76. 7 Am.Jur.2d *Attorney General* § 6 (2009).

77. *Wilkinson*, 828 S.W.2d at 618 (Leibson, J., dissenting).

78. By overruling *Wilkinson*, we plow no new legal ground; instead, we merely return the law to what it rightfully was before the unfortunate language in *Wilkinson*. *See, e.g., Paxton*, 516 S.W.2d at 868 ("We think that if the Constitution is threatened by an item of legislation, the Attorney General may rise to the defense of the Constitution by bringing a suit[] and is not required to wait until someone else sues.... There is no question as to the right of the Attorney General to appear and be heard in a suit brought by someone else in which the constitutionality of a statute is involved. We hold that his constitutional,

fore, we reject the DOC's argument that the Attorney General lacked standing to bring the Franklin Circuit Court action.

### 2. *No Violation of Truth–in–Sentencing Laws.*

■ In his motion for CR 65.07 relief, the Attorney General adopts the Pulaski Circuit Court's concern that retroactive application of HB 406 would threaten the integrity of jury verdicts, presumably because of the so-called "early release" of prisoners or parolees. We disagree.

First, the DOC has convincingly shown that many, if not all, of the specific prisoners or parolees about whom the Attorney General complains were not released "early." More importantly, we reject any argument that retroactive application of HB 406 undermines Kentucky's truth-in-sentencing law.

KRS 532.055 provides that evidence may be offered relevant to sentencing, including information regarding minimum parole eligibility and the minimum expiration of sentences.[79] Nothing in HB 406 affects KRS 532.055 or any related truth-in-sentencing laws. Retroactive application of HB 406 does not change an offender's

minimum parole eligibility date, nor does HB 406 change the method of calculating an offender's minimum or maximum expiration of sentence date. The information provided to juries under KRS 532.055 is unaffected by HB 406, and we perceive no conflict between a retroactive application of HB 406 and Kentucky's truth-in-sentencing system.

### 3. *No Violation of Separation of Powers Doctrine.*

■ Similarly, we find no separation of powers violation. The Attorney General briefly contends that HB 406 violates Sections 27 and 28 of the Kentucky Constitution, which contain the separation of powers clauses.[80] As we understand it, the Attorney General contends that HB 406 impermissibly interferes with the judicial branch's exclusive power to sentence criminal defendants. We disagree.

Nothing in the language of HB 406 alters, amends, or affects the sentences imposed upon criminal defendants in the courts of the Commonwealth. All HB 406 does, relative to these appeals, is amend eligibility for a final discharge from parole from a prisoner or parolee's maximum ex-

---

statutory[,] and common law powers include the power to initiate a suit questioning the constitutionality of a statute.") (citations omitted).

**79.** KRS 532.055(2)(a) provides, in relevant part, that the Commonwealth may offer evidence in the sentencing phase about "[m]inimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor[,]" and "[t]he maximum expiration of sentence as determined by the division of probation and parole for all such current and prior offenses...."

We are aware that "though not raised by the parties, ... we have struck down another subsection of KRS 532.055 as being an unconstitutional violation of the separation of powers doctrine." *Torrence v. Commonwealth*, 269 S.W.3d 842, 845 n. 11 (Ky.

2008). However, the constitutionality of the sections of KRS 532.055 germane to this case have not been challenged by the parties; and we decline to do so on our own motion. *Id.*

**80.** Section 27 provides, in relevant part, that the powers of the government of this Commonwealth "shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." Similarly, Section 28 provides that "[n]o person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

piration date to the minimum expiration date and provide that a prisoner or parolee shall get credit against the sentence for time served on parole. Since those are not judicial functions, HB 406 simply does not unconstitutionally interfere with any function of the judicial branch.[81]

### 4. *No Violation of KRS 197.045.*

KRS 197.045(1) provides, in relevant part, that "[a]ny person convicted and sentenced to a state penal institution may receive a credit on his sentence of not exceeding ten (10) days for each month served, except as otherwise provided in this section, to be determined by the department from the conduct of the prisoner." In a bare bones, one-paragraph-long argument, the Attorney General contends "HB 406 abrogates the restrictions imposed by KRS 197.045(1), which limits 'good time' to months 'served.' Consequently, under [HB 406,] offenders receive 'street credit' and 'good time' while on parole, *i.e.,* a double benefit." We disagree.

Subsection four of Section I(5)(c) of HB 406 requires that "the period of time spent on parole shall count as a part of the prisoner's remaining unexpired sentence when it is used to determine a parolee's eligibility for a final discharge from parole as set out in subsection (5) of this section." Subsection five of that same section provides, in relevant part, that "a final discharge shall be issued when the prisoner has been out of prison on parole a sufficient period of time to have been eligible for discharge from prison by minimum expiration of sentence had he not been paroled. . . ." Taken together, those two subsections mean that time spent on parole shall count as if it were time served in prison in order for parolees to be discharged on their minimum expiration dates. A minimum expiration date is a maximum expiration date minus any good time credit. So if no good time credit were authorized, parolees would not have minimum expiration dates, thereby rendering subsection five's directive that parolees be finally discharged on their minimum expiration dates to be either illogical or null. "We should not suppose that the legislature intended to be intentionally illogical, nor should we interpret the statute to bring about an obviously illogical result." [82] Likewise, "[a]ll parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual." [83]

Finally, our conclusion would not be altered even if we accepted, solely for the sake of argument, the Attorney Gener-

---

81. *See, e.g., Wilson v. Commonwealth,* 141 Ky. 341, 132 S.W. 557, 561 (1910) (construing then-current statutes granting the Board of Penitentiary Commissioners the power to grant parole to not be unconstitutional because "the powers confided to the board are not in any sense judicial, but purely ministerial and similar in character to the power conferred upon the Governor of the state to grant reprieves, commutations and pardons, after conviction. The power given the board to shorten the term of imprisonment of persons confined in the penitentiary is no more unconstitutional than the power to parole them, which it has long exercised under a previous act of the Legislature; nor is the power to lessen the period of imprisonment or dis-

charge the prisoner any more an interference with the judicial functions of the court in which he was convicted than is the power to grant a parole. In *George, etc., Com'rs. v. Lillard, Warden,* 106 Ky. 820, 51 S.W. 793, 1011, [21 Ky.L.Rptr. 483 (1899)], we held that the parole law, a predecessor of the act in question, was not unconstitutional, nor did it in any way encroach upon the judicial functions of the courts, or the power of the Governor to pardon.").

82. *Floyd v. Gray,* 657 S.W.2d 936, 941 (Ky. 1983) (Leibson, J., dissenting).

83. *Lewis,* 189 S.W.3d at 92.

al's contention that HB 406 violates KRS 197.045(1). Part III, Section 10 of HB 406 provides that "[a]ll statutes and portions of statutes in conflict with any of the provisions of this Act, to the extent of the conflict, are suspended unless otherwise provided by this Act." So KRS 197.045(1) must yield to HB 406, even if we were to assume a conflict between the two pieces of legislation.[84]

## IV. *CONCLUSION.*

For the foregoing reasons, the Court ORDERS:

1) The Attorney General's request for relief under CR 65.07 in case no. 2009–SC–000107–TG is denied;

2) The DOC's petition for a writ of prohibition in case no. 2009–SC–000252–TG is granted; and the Pulaski Circuit Court is prohibited from enforcing the permanent injunction, entered April 29, 2009, which purported to prohibit the DOC from releasing from custody or parole supervision any prisoner or parolee as a result of a retroactive application of HB 406;

3) The stay issued by this Court on May 13, 2009, in the Pulaski Circuit Court action (case no. 2009–SC–000252–TG) is lifted; and

4) These actions are remanded to the Franklin and Pulaski Circuit Courts, respectively, for further action consistent with this Opinion and Order.

All sitting. ABRAMSON, CUNNINGHAM, NOBLE, SCHRODER, and VENTERS, JJ., concur. SCOTT, J., concurs in result only.

SCOTT, J., concurring in result only.

Because I believe the Pulaski Circuit Court exceeded its jurisdiction in this instance by issuing a statewide injunction against the Kentucky Department of Corrections, I can only concur with the majority in result only.

As was clearly noted by the Commonwealth in its Petition for Writ:

The request for the injunction was made by Eddy Montgomery in his official capacity as the duly elected Commonwealth's Attorney for the 28th Judicial Circuit comprising Lincoln, Rockcastle and Pulaski County. He was acting pursuant to KRS 15.725 and KRS 69.010. KRS 15.725(1) specifically states that:

The Commonwealth's attorney shall attend each Circuit Court held in his judicial circuit. He shall, except as provided in KRS 15.715 and KRS Chapter 131, have the duty to prosecute all violations whether by adults or by juveniles subject to the jurisdiction of the Circuit Court of the criminal and penal laws which are to be tried in the Circuit Court in his judicial circuit. In addition, he shall have the primary responsibility within his judicial circuit to present evidence to the grand jury concerning such violations.

KRS 69.010(1) specifically states that:

Except as provided in subsection (2) of this section, the Commonwealth's attorney shall, except in Franklin County, attend to all civil cases and proceedings in which the Commonwealth is interested in the Circuit Courts of his judicial circuit.

This limitation was recognized initially by the Pulaski Circuit Court in its Tempo-

---

**84.** Since it is not necessary for the proper operation of HB 406, we do not perceive that it is necessary for the previously discussed laws regarding different treatment regarding probation and parole given to sexual and violent offenders to have been suspended during the effective period of HB 406.

rary Injunction Order of September 15, 2008, thus, its effect was limited to all prisoners from the 28th Judicial Circuit—Lincoln, Rockcastle and Pulaski Counties. The limitation was ignored, however, in its permanent injunction—which extended statewide.

I fear—by recognizing a statewide power of all the circuit courts in circumstances similar to this—we diminish the power of the Attorney General, dilute the jurisdiction of the Franklin Circuit Court, and encourage "circuit shopping" on issues such as this that are critical to the governance of Kentucky.

ENTERED: November 25, 2009.

/s/ John D. Minton Jr.
 Chief Justice